**EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN, Appellant,**

v.

**Alton A. PARKER, Appellee.**

**No. 14577.**

Court of Civil Appeals of Texas.

San Antonio.

July 31, 1967.

Rehearing Denied Sept. 20, 1967.

House, Mercer, House & Brock, San Antonio, for appellant.

Lieck & Lieck, San Antonio, for appellee.

CADENA, Justice.

This is a Workmen's Compensation case in which Employers Mutual Liability Insurance Company of Wisconsin, defendant, appeals from a judgment rendered against it and in favor of plaintiff, Alton A. Parker, in conformity with a jury verdict to the effect that plaintiff was totally and permanently disabled due to cancer resulting from his exposure, during the course of his employment, to radiation from radioactive materials.

Defendant contends that the trial court erred in overruling its motion for judgment non obstante veredicto because there is no evidence that plaintiff's cancer was the result of work-incurred radiation.

On May 22, 1961, plaintiff began to work for a private employer engaged in the performance of work under a contract with the United States of America at a governmental installation located about ten miles west of the City of San Antonio. A pre-employment physical examination and annual physical examinations prior to April 1965, revealed no evidence that plaintiff was suffering from cancer. In April, 1965, plaintiff noticed a swelling on the left side of his neck. He consulted a doctor, who referred him to Dr. James W. Nixon, Jr. On June 15, 1965, Dr. Nixon surgically removed the mass, which was diagnosed as a "metastatic[1] carcinoma in the cervical lymph node." Although a histological analysis[2] of the malignant cells strongly suggested that the primary tumor was a semi-

noma, or cancer of the testicle, no definite conclusion concerning the site of the primary tumor was reached. While several examinations of plaintiff's testicles yielded no evidence of seminoma, the nature of the examinations was such that the possibility of a testicular tumor was not eliminated.

■ Under Section 20(h) of Article 8306, Vernon's Ann.Civ.St. (1967), plaintiff is entitled to compensation if his disability resulted from a disease caused by exposure to x-rays or radioactive substances. The evidence in this case is clearly sufficient to establish that prior to May, 1962, when plaintiff began work at the governmental installation, he was not suffering from cancer; that from May, 1962, to April, 1965, plaintiff was exposed to artificial[3] radiation in the course of his employment; and that by April, 1965, plaintiff had developed a cancer in the left cervical lymph node. However, mere proof that plaintiff was not suffering from cancer before exposure to radiation and that, after such exposure, he developed cancer is not sufficient, standing alone, to support a finding of causal connection between the radiation and the disease. The medical evidence in this case conforms to the well-known fact that cancer is a disease of esoteric etiology. Although, except to the legal mind, with its peculiar thought processes, it may seem anomalous to say that only experts may testify as to facts or matters concerning which they profess ignorance, it seems to be settled in Texas that the question of causal connection between a traumatic

---

1. Metastasis is the transportation of loose clumps of tumor cells, or even single cells, by the blood or lymph stream from a primary or initial growth to a distant focus or organ, where a secondary growth may then take place. This secondary growth may far outstrip the primary tumor in size. Flaxman, Trauma and Cancer, in Medical Trial Technique Quarterly, 223, 229 (1958 Annual).

2. As a rule, the metastatic tumor reproduces the histological (cellular) structures of the primary tumor with considerable fidelity, so that an idea of the kind

of primary growth can be formed by examining the secondary growth. Id.

3. Natural or background radiation is that which results from natural causes such as cosmic rays and naturally occurring radioactive elements in the earth, atmosphere, common building materials, and in the body which are unstable and break down with the emission of radiation. Most of the artificial radiation to which we are exposed results from fall out from weapon testing; occupational radiation hazards; and x-rays.

event, or series of events, and the subsequent development or aggravation of an existing tumor, is a "question of science determinable only from the testimony of expert medical professionals." Insurance Co. of North America v. Myers, 411 S.W. 2d 710 (Tex.Sup.1967). However, Texas does not require that the expert testimony concerning causal relation be based on reasonable medical certainty. As Mr. Justice Steakley pointed out in Myers, causal connection in such a fact situation must rest on reasonable medical probabilities.

The evidence in this case discloses that from May 22, 1961, until September, 1963, plaintiff worked as a material handler. His principal duty consisted of carrying materials, some of which were radioactive, from the warehouse or storage areas to locations where other employees, known as production operators, were engaged in the assembling and disassembling of weapons, including nuclear weapons. While the evidence was conflicting as to whether the radioelements were always kept in shielded containers, the record discloses that, even if such containers were shielded, "there was a radiation field associated with the radioactive material that would actually come out through the protective" shield. Material handlers were not furnished any apparel or other devices designed to protect them against radiation, nor was any effort made to determine the amount of radiation to which they were exposed.

In September, 1963, plaintiff's job classification was changed to that of production operator, and from that time until the neoplasm on the left side of his neck was discovered in April, 1965, he was engaged, at least from time to time, in the assembly and disassembly of nuclear weapons. Since production operators were subject to greater risk from radiation than were material handlers, they were required, when handling radioactive isotopes, to follow certain safety procedures, and were furnished protective apparel and radiation-measuring devices. The protective clothing generally consisted of leaded aprons and gloves. The standard measuring device was a film badge which was worn on the wrist or some other portion of the body, but always under the leaded glove or leaded apron. The badges, after they had been worn for a week, were sent to a laboratory for a determination of the amount of exposure to radiation. Plaintiff was issued such a badge on four occasions, and an analysis of these badges revealed only two periods of exposure, one during the period of February 17–23, 1964, and the other during the period June 8–14, 1964. An analysis of the badges worn by plaintiff during these two periods indicated that he had been subjected to a total of 36 millirems [4] of radiation. However, the evidence in this case amply supports the conclusion that plaintiff's exposure to radiation was greatly in excess of 36 millirems,[5] although it does not reveal the precise amount of exposure.

4. Several units of radiological measurement have been developed. The *roentgen* represents the amount of radiation producing one electrostatic unit in a cubic centimeter of dry air. Although this is an absolute unit of exposure, and not a unit of dose. The really significant factor is the amount of radiation absorbed in tissue. Therefore, another unit of measurement has been established, the *rad*, a a unit of Radiation Absorbed dose. But since no one measuring unit can cover the range of energies, kinds of radiation and the range of effects that medical science must think of, the *rem* has been developed as a "unit of convenience." The record in this case contains no definition of a rem, but, apparently, the rem is the rad multiplied by an index of relative biological effect. A millirem is one one-thousandth of a rem.

5. There is evidence in the record which supports the conclusion that, since the badge was always worn beneath protective clothing, it measured only 1/15 of the total amount of millirems to which the surface of the badge was, in fact, subjected. This would mean that unprotected areas of the body, such as the neck, would be subjected to fifteen times as many millirems as would the protected badge. Therefore, on the two occasions discussed in the opinion, it can be concluded that the exposed portions of plaintiff's body were, in fact, subjected to 540, rath-

There was medical testimony to the effect that exposure to radiation *can* cause cancer, and that a person working around radiation "does have a higher than normal risk of developing malignant changes in his tissues."

In answer to hypothetical questions concerning the probability that radiation caused plaintiff's cancer, Dr. Sidney Schiffer stated that he would not make a statement of probability either way. He merely admitted that radiation could have played a part, adding, "we just simply don't know enough." He further stated that, in his opinion, a diagnostician could not say whether plaintiff's cancer was caused by radiation. He listed as factors which may cause a cell to become cancerous, viruses, chemical agents, aging, physical agents, hormone factors and radiation. Although he admitted that, theoretically, it was impossible to exclude any one or all of these factors in plaintiff's case, since the cause of cancer is unknown, it was possible, from a practical standpoint, to exclude physical factors and chemical factors. However, he testified that it was not possible to exclude viruses or the hormone and radiation factors as possible causes of plaintiff's tumor.

Dr. Vincent Collins testified that medical science has not proved any one cause for lymphoma, or cancer of the lymph nodes. He also stated that there was no way to determine what caused a particular cancer, and that a cancer arising on the basis of chance cannot be distinguished from a cancer caused by radiation.

Dr. Wright Langham, a member of the National Committee on Radiation Protection, and a former member of the International Commission on Radiation Protection, testified that both of those bodies had established 5 rems (5,000 millirems) as the maximum safe annual dosage of radiation. This is the amount of "whole body radiation" which has an "insignificant probability of doing the individual any demonstrable harm at any time during his natural life." This amount refers to accumulated dosage over a period of a year. It is believed that a person may safely absorb as much as three rems in three months, but, in the event of such exposure over a three-month period, any further exposure during the following three months would not be considered safe. However, there is nothing in the testimony of this witness to indicate that exposure to a dosage in excess of the safe maximum annual dose would be likely to cause cancer.

Dr. George C. Maney, after stating that, in his opinion it has been established that radiation is an etiological factor in leukemia and cancer of the thyroid, said that it is possible that a person exposed to radioactive material over a long period of time would develop cancer. However, he said he was unable to answer a question concerning the amount of exposure which would be required over a period of time to develop a cancerous condition in a human being.

An examination of the expert testimony in this case reveals that no medical expert testified that radiation was the probable cause of plaintiff's cancer. No witness testified in terms stronger than a

---

er than 36, millirems of radiation. In addition, the evidence shows that on one occasion, while plaintiff was in an area in which an "incident" occurred in connection with the testing of a machine described as an "iridium source," the protected badge worn by a worker in the area showed that he had been subjected to 6½ rems (6,500 millirems) of radiation. There is nothing in the record, however, showing the proximity of plaintiff to the location of the "incident" or

the number of rems to which he was, in fact, subjected. The evidence further showed that, during the more than two years that plaintiff worked as a materials handler, he was exposed to radiation which "leaked" even from shielded containers. Since material handlers were issued no measuring devices, it is impossible to tell the amount of radiation to which plaintiff was subject during this period.

"possibility." No witness was willing to go beyond admitting that, under some circumstances, exposure to radiation "could" or "can" cause cancer. We are mindful of the fact that the disease in question is one concerning which medical knowledge is limited, and that the medical issue presented is one which hardly permits unqualified and unequivocal answers. We also agree with plaintiff that, as pointed out in the Myers decision, reasonable probability is determined by consideration of the substance of the medical testimony, and "does not turn on semantics or on the use by the witnesses of any particular term or phrase." 411 S.W. 2d at 710. However, we are convinced, after reviewing the entire testimony, that in this case an inference of causal connection can be no more than speculation and conjecture. In view of the fact that the opinions expressed by the medical experts were given without accurate information concerning all of the facts of the case, particularly the amount of radiation to which plaintiff had probably been exposed, it is not surprising that the opinions expressed were cautious and not stated with unhesitating conviction.[6]

Plaintiff relies strongly on testimony to the effect that, assuming exposure to amounts of artificial radiation set forth in hypothetical questions, it was more probable that plaintiff's cancer was due to artificial, rather than to natural or background radiation. However, a reading of this testimony in context reveals the fact that such opinions were based on the assumption that plaintiff's tumor had, in fact, been caused by radiation of some kind.

As already pointed out, we do not have before us a case in which as in Atkinson v. United States Fidelity & Guaranty Co., 235 S.W.2d 509 (Tex.Civ.App., 1950, writ ref'd n. r. e.), possible factors in the development of cancer, other than exposure to radiation, have been eliminated as possible causes of plaintiff's cancer. Under these circum-

stances, we are constrained to hold, in conformity with the recent decision by our Supreme Court in Myers, that testimony to the the effect that radiation "may have," "could have" or "possibly" caused plaintiff's tumor is, standing alone, no evidence of a causal connection between such exposure and the subsequent development of the cancer. See Note, 31 Tex.L.Rev. 446.

It may well be that, in view of the present state of medical knowledge on the subject, we are imposing upon plaintiff a Sisyphean task in requiring that he produce medical testimony showing that, in reasonable medical probability, his tumor was caused by radiation. However, we do not believe that the "reasonable medical probability" rule leaves us any alternative.

The judgment of the trial court is reversed and judgment is here rendered that plaintiff take nothing.

---

6. The only positive opinions stated by any expert witnesses were to the effect that, assuming that plaintiff was subjected, over a four-year period, to only 36 millirems of radiation, the tumor in question was not caused by radiation.