**Kerry Andrus CROCKER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 54261.**

Court of Criminal Appeals of Texas,
Panel No. 2.

May 10, 1978.

Rehearing Denied Nov. 22, 1978.

Percy Foreman and Dick DeGuerin, Houston, Frank Maloney, Kenneth E. Houp, Jr. and David H. Reynolds, Austin, for appellant.

Carol S. Vance, Dist. Atty., Robert A. Scults and Mike Hinton, Asst. Dist. Attys., Houston, for the State.

Before ONION, P. J., and DOUGLAS and ODOM, JJ.

## OPINION

DOUGLAS, Judge.

On May 2, 1974, appellant was charged by indictment with five offenses under the former penal code. The State alleged that on or about August 28, 1972, appellant assaulted with the intent to murder Michael Kirk Crocker, that he deprived Michael Kirk Crocker of one of his testicles, that he disfigured Michael Kirk Crocker, that he assaulted with the intent to maim Michael Kirk Crocker, and that he intentionally caused injury to a minor, Michael Kirk Crocker. The trial commenced on April 2, 1975, and concluded on April 17. At the close of the testimony, the State elected to proceed on the castration and disfiguring counts only. These counts were submitted to the jury in the alternative in the court's charge. The jury found appellant guilty of castration under Article 1168, V.A.P.C. (1925).[1] After appellant elected to be punished under the pertinent provisions of the current penal code, the jury assessed his punishment at ten years' confinement in prison and a five thousand dollar fine, and he appeals. We affirm.

The facts are as follows. Appellant is a registered petroleum engineer. On November 18, 1971, the State of Texas granted him a license authorizing him to possess one one-curie source of cesium 137, a radioactive substance. A source of cesium 137 emits gamma ray radiation even though the element is encased in a steel capsule. The license was amended on March 17, 1972, to permit appellant to possess one two-curie source of the substance and was again amended on August 2, 1972, to allow him to possess two two-curie sources. His stated purpose in obtaining these radioactive sources was to use them for logging oil wells. According to James Gorrell, the licensing supervisor for the Radioactive Material Branch of the State Department of Health, appellant could possibly have obtained multiple radioactive sources in excess of the number authorized by the license by reusing it.

Ed Bailey was a nuclear engineer and the Chief of the Compliance and Instruction Program, Radiation Control Branch, State Department of Health. He conducted a series of inspections which showed that appellant possessed radioactive materials during 1972. Bailey, who saw the materials which were seized from appellant when his license was revoked, testified that those radioactive sources were very similar to the State's first exhibit. Bailey identified the State's second and twenty-third exhibits as instruments which are utilized for handling such radioactive sources. Appellant owned similar instruments.

Sidney Morrison operated an oil well logging and perforating service company until just prior to the time of the trial. The company's activities included conducting radioactive logs on oil and gas well completions. In 1971, while Morrison was licensed to possess radioactive substances, he and appellant had several conversations pertaining to the use of such substances. Appellant asked Morrison about the dangers associated with exposure to radiation, what constituted safe durations of exposure, what constituted a safe distance from the radioactive source, how the effects of radiation sickness are manifested, and related questions. Appellant was an independent petroleum engineer at that time and, according to Morrison, did not need extensive knowl-

---

1. This article was repealed by Acts 1973, 63rd Leg., chapter 399, section 3(a), page 991, effective January 1, 1974. See V.T.C.A., Penal Code, *Enactment*, Section 6(a), which provides that any offense committed before the effective date of the new penal code is still governed by the former code.

edge of radioactive materials because independent consultants ordinarily employ well logging companies to perform the services that require the use of such materials. Appellant had employed Morrison's company in this capacity on several occasions.

Appellant went to Morrison's office in the latter part of 1971 and made copies of Morrison's license without his knowledge or permission. Appellant never told Morrison that he had obtained a license authorizing him to possess radioactive sources.

The complaining witness, Kirk Crocker, is appellant's son. Kirk was eleven years old on August 28, 1972, the date of the offense alleged in the indictment. He was fourteen years old when the case was tried.

Appellant was divorced from Kirk's mother, Barbara Buckley Smith, in May of 1970. They were remarried in July of the same year but divorced again in February of 1971. Appellant was given certain visitation rights with respect to Kirk and Kirk's younger brother, Patrick. The brothers usually visited appellant at his apartment during the first and third weekends of each month and during a thirty-day period in the summer.

While Kirk and Patrick were visiting appellant in April of 1972, appellant told Kirk to listen to the television with the earphones only. Appellant then left Kirk alone in the apartment. When Kirk put on the instrument he noticed that cotton had been placed in it and, after pulling out the cotton, he found a small metal cylinder hidden inside each earpiece. Becoming frightened, he contacted his mother. She told him to watch the television without the earphones. When appellant returned and saw that Kirk was not using the earphones, he became angry. Kirk testified that the metal cylinders were very similar to those constituting the State's first exhibit.

Kirk and Patrick visited appellant one weekend in the early part of July of the same year. Before Kirk went to bed on Friday evening appellant gave him a glass of orange juice. After drinking the juice, Kirk observed a partially dissolved pill in the bottom of the glass. He became tired and drowsy and went to sleep earlier than usual.

Kirk slept on the couch in the den. During the night he awoke and saw appellant squatting beside him. Appellant told Kirk that he thought Kirk was having a nightmare. Appellant left and Kirk went back to sleep. Later the same night Kirk again awoke and saw appellant "crouching down in front of the couch fooling with something on the ground." Kirk questioned appellant about his activities and appellant stated only that Kirk "must have had another nightmare." Becoming suspicious, Kirk searched the couch and the area surrounding it after appellant returned to his room and discovered a sock under the cushion upon which he had been sleeping. The sock was thin and contained the impressions of two cylinders that were similar in shape to those he had found in the earphones.

Kirk also observed an instrument on an end table which he identified at trial as being similar to the State's second and twenty-third exhibits (which were instruments used for handling radioactive sources). This instrument was removed after Kirk again went back to sleep. When he awoke the next morning he inquired about the nature of the instrument. Appellant told him that it was used to clean guns.

That morning, Kirk became nauseous and started vomiting. He had not been ill the night before.

A similar incident occurred while Kirk and Patrick were visiting appellant on a later weekend in the same month. On Friday evening, appellant gave Kirk a glass of orange juice, and again Kirk noticed a partially dissolved pill in the glass. Kirk became tired and wanted to go to bed early. Appellant told Kirk to sleep in his bed because he (appellant) had guests in the den at that time. Before Kirk went to sleep appellant replaced the two pillows he ordinarily used with another pillow.

When Kirk awoke the next morning he heard a "rattling" sound which originated inside the pillow. He unzipped it and found a medicine bottle containing three metal

cylinders; two were like those he had seen earlier and one was somewhat smaller. When he arose he discovered that he was alone in the apartment. Appellant and Patrick had slept in the bedroom of an adjacent apartment. Later that day Kirk again became ill and started vomiting.

At about the time this incident occurred Kirk's thighs "broke out" with raw and painful marks which had the appearance of bruises. He was treated for this condition by a doctor named Speers.

By August, a serious lesion had formed on each thigh. According to Kirk, these lesions "were raw, kind of like a big cut, and they were oozing and stuff." Another problem developed in his right thumb which became red and painful. It was with his right hand that Kirk had picked up the medicine bottle containing the metal cylinders.

Appellant picked up Kirk and Patrick in August for their summer visitation with him. But after several days passed he took the brothers back home because their mother was moving into a new house. Shortly thereafter, Mrs. Smith took Kirk to see Dr. Speers again because the boy's thigh condition was worsening. Appellant came to the doctor's office while Kirk was there and took him away. Mrs. Smith protested and the police were called but they permitted appellant to take Kirk with him. Although Dr. Speers had prescribed medication for Kirk's legs, appellant did not take it with him when he left the office.

Kirk stayed with appellant for a few days. One morning Kirk came out of the bathroom and saw appellant "fooling with the couch." Appellant told Kirk that he was leaving and that Kirk should lie on the couch while he was gone. Appellant further instructed Kirk not to answer the door or the telephone. When appellant left, Kirk looked under the sofa cushion and found the same sock containing two cylinders that he had seen before. He became frightened and decided to lie on the floor. Appellant became angry when he returned and found Kirk on the floor instead of on the couch. Appellant told Kirk to go into

the bathroom and bathe because he was going to take him home. When Kirk came out of the bathroom he saw appellant walking out of the apartment and carrying the sock extended from his body at arm's length in order to prevent it from touching him.

Kirk's injuries became increasingly severe in the following weeks. In October of 1972, appellant took Kirk and Patrick to his apartment where they stayed throughout the night. The next day appellant's girl-friend arrived. Appellant left Patrick with her in the apartment and drove Kirk to Orange. At that time appellant and Kirk discussed Kirk's fear of the metal cylinders. Appellant told Kirk that he "must have been dreaming" because appellant did not possess anything of that nature.

After this discussion appellant and Kirk registered at a motel in Orange. Before Kirk went to bed that evening appellant gave him a glass of orange juice and, again, Kirk observed a partially dissolved pill in the glass. Kirk went to sleep but awoke during the night and saw that the lights in the room had been turned on. Finding a sock containing two cylinders draped on his side, he pushed it onto the floor and got up to look for appellant but was unable to find him. Kirk eventually went back to bed.

Kirk's final visit to appellant's apartment occurred on January 1, 1973. While Kirk was there he saw in an ashtray what appeared to be the third—and smallest—cylinder which he had previously seen in the medicine bottle hidden in the pillow. He asked appellant about the object and appellant stated that it must have been one of Patrick's toys.

Patrick Crocker was eleven years old at the time of trial. He testified that on three occasions while he and Kirk were visiting appellant Kirk slept alone in appellant's apartment while he and appellant slept in another apartment. On another occasion appellant awoke him during the night and told him that they were going to sleep in appellant's automobile. Kirk was sleeping on the couch in the apartment. Patrick testified that before he and appellant went

to the automobile appellant "did something" to Kirk.

Kirk and appellant sometimes discussed petroleum engineering and related subjects, but Kirk never knew that his father had access to radioactive materials.

Kirk's symptoms continued to worsen in 1973. He developed large, deep lesions on his thighs and on one ankle, the "burn" on his thumb became more serious, and all the hair on one side of his head fell out temporarily. As a result, Kirk was hospitalized for several weeks during the summer. Later, Kirk became unable to walk and was again hospitalized for several months. He was confined to a bed or wheelchair until six months prior to trial. Before these symptoms evolved Kirk was healthy and active in athletics, but at the time of the trial he had undergone fourteen or fifteen operations and was still weak.

The State presented extensive medical testimony at trial. This testimony will be discussed later in connection with appellant's contention that the evidence is insufficient to show causation.

At the close of the State's case-in-chief, appellant moved that the State be required to elect which one of the five counts of the indictment it was relying upon for conviction. The trial court denied the motion. After all the evidence was presented, the State abandoned the fourth (assault with intent to maim) and fifth (intentional injury to a child) counts of the indictment. At this time appellant's motion for election was renewed and again overruled. The State then abandoned the first count and proceeded under the castration and disfiguring counts only.

The State alleged that the offense occurred on or about August 28, 1972. In the charge, the court authorized the jury to find that appellant committed the offense of castration or disfiguring, but not both, on or about that date. The court then instructed the jury as follows:

"In this case, the State relies on a number of alleged incidents allegedly constituting one continuous transaction. You are instructed that the words 'on or about' as stated in each count of the indictment with which you are concerned means any date prior to the return of the indictment and within the statute of limitations for the offenses so charged. You are instructed as a matter of law that the statute of limitations for the offenses of castration and disfiguring is three years each."

Reasoning that the five alleged incidents of radiation exposure were distinct criminal acts, appellant objected to the charge on the ground that it presented these acts to the jury as constituting one offense. The objection was overruled.

Appellant contends that the trial court erred twice with respect to the concept of election. He first argues that the court should have required the State to elect a single count upon which to proceed after the evidence was presented and, secondly, that the court further should have required the State to elect and rely only upon those incidents of radiation exposure resulting in a single offense and then instructed the jury accordingly.

In *Vannerson v. State*, 408 S.W.2d 228, 229 (Tex.Cr.App.1966), this Court held that the State may allege, in a single indictment, two or more offenses in separate counts, if the offenses arise out of the "same incident, act or transaction." In this regard, the State may elect during the trial which count it will rely upon to seek a conviction or it may refuse to make an election and "the court instead of compelling an election may submit each of the counts to the jury with the instruction that a conviction could be had on only one of them." *Jackson v. State*, 131 Tex.Cr.R. 287, 98 S.W.2d 193, 194 (1936). *See also Flowers v. State*, 150 Tex.Cr.R. 467, 202 S.W.2d 462, supplemented 150 Tex.Cr.R. 467, 203 S.W.2d 539 (1947). No double jeopardy problems are extant with this type of submission because the jury returns either an acquittal or a verdict of guilty on one count only.

In the present case, there was evidence introduced at trial showing that Kirk had been exposed to radiation and that, as a

result, one of his testicles had ceased to function and the other had been totally eliminated. There was other evidence that radiation-induced injuries had caused disfiguring marks on Kirk's body. Although the State did not isolate a cause and effect relationship between any one exposure and the castration or disfigurement, it did establish that the same series of exposures caused both injuries.

In *Webster's Third New International Dictionary* (1972), transaction is defined as an "act, process, or instance of transacting." In *Whitford v. State*, 24 Tex.App. 489, 492, 6 S.W. 537, 538 (1887), the Court of Appeals stated:

> "There is a difference between a crime and a criminal transaction. A criminal transaction may be defined to be an act, or a series of acts, proceeding from one wrong impulse of the will, of such nature that one or more of them will be indictable. * * * In reason, there may be any number of distinct crimes in a single criminal transaction. This comes from the fact that, the words of our language being limited, while the transactions of life may almost be termed infinite in variety, and the lines to be drawn around specific offenses being necessarily incomparably more limited than the words, it is impossible that there should be an exact outline of crime whose circumference shall exactly coincide with every criminal transaction. The consequence is that the law does, what it must, declare this combination of act and intent to be indictable; then another combination, and another, and so on, until it has proceeded far enough, where it stops. And when this is done it is impossible that the inhibitions should be so distinct that no one shall embrace anything forbidden by another. Therefore, it is established doctrine that more than one offense may be committed by a man in one transaction. . . ." *Accord*, 22 C.J.S. *Criminal Law* § 1 (1961).

■ It is clear from the foregoing that the series of acts in the instant case constituted one criminal transaction. The court did not err in refusing to require the State to elect between the castration and disfiguring counts because both arose out of the same transaction and because the jury was authorized to return a guilty verdict on one count only. *Vannerson v. State*, supra; *Jackson v. State*, supra.

The more difficult question is whether each incident of radiation exposure constituted a separate and completed offense which could have supported a conviction and thus required the State to make an election among the five incidents proven.

■ When the State alleges one offense in one count, it is required to elect "only where the evidence discloses two or more transactions, *each of which is an offense for which the defendant may be convicted.*" *Rivas v. State*, 496 S.W.2d 600, 602 (Tex.Cr. App.1973) (emphasis added). In *Bates v. State*, 165 Tex.Cr.R. 140, 305 S.W.2d 366 (1957), the defendant was charged in a one-count indictment with statutory rape. He was convicted after the proof showed that he had had sexual intercourse with the prosecutrix several times within the year prior to the date of the return of the indictment. Each act of intercourse was a distinct, completed offense. This Court reversed the conviction because the State had not been compelled to elect which act it would rely upon.

No election is required, however, where one offense arises out of multiple transactions. In *McClelland v. State*, 390 S.W.2d 777 (Tex.Cr.App.1965), this Court held that the State was not required to elect in a prosecution for bribery involving many transactions. There, the transactions occurred on numerous occasions during an eighteen month period. During that time the defendant, who was then Probate Judge of Harris County, accepted bribes from five different individuals in order to secure their appointment as appraisers, administrators and guardians in proceedings before his court on 3,511 occasions. During the same period of time 257 other persons were appointed to act in this regard on 2,225 occasions. The defendant established a bank account under the name of a Texas corpora-

tion, and the five individuals deposited in this account a portion of the fees they received as the result of their appointments in the probate court. The corporation conducted no business but the money in its account was disbursed to the defendant for his own use and benefit.

The evidence presented at trial showed the series of appointments, deposits and withdrawals in connection with the bribery scheme. Rejecting the defendant's contention on appeal that the State should have been required to elect one specific transaction, we stated:

". . . As we view the charge, when [the defendant] agreed with one or more of these five to accept a bribe, to take something of value to influence his judgment, and he then did so, the offense was complete. The various payments . . . were things done in furtherance of the operation agreement. The various acts and transactions of each of the five were admissible to show their scheme and design and agreement with appellant and their understanding with him, as well as being admissible to show the completion of the bribery act by them. *We are not here dealing with extraneous offenses, but we are dealing with one offense involving many transactions.*" 390 S.W.2d at 780 (emphasis added).

■ Therefore, where the State establishes an interrelated series of acts or transactions in order to show one completed offense no election is required. Under these circumstances the State cannot subsequently prosecute the accused for the individual transactions because each transaction is a part of the same case. *McCaleb v. State,* 537 S.W.2d 728 (Tex.Cr.App.1976).

■ In order to prove the completed offense of castration in the present case, the State was required to establish that appellant willfully and maliciously deprived Kirk of any part or all of either or both of his testicles by exposing him to radiation. To prove the completed offense of disfiguring, the State was required to establish that appellant willfully and maliciously placed a mark on Kirk's person by exposing him to radioactive sources. *See* Article 1167, V.A. P.C. (1925).

The evidence showed that no single exposure to radiation caused Kirk's injuries and the disfiguring marks that resulted therefrom. Rather, the injuries were caused by the totality of the multiple exposures to radiation and evolved gradually over an extended period of time. Indeed, the ultimate severity of these injuries could not even be determined until several months after the final incident of radiation exposure had occurred. It is clear, then, that no single incident or transaction was a distinct, completed offense, and that one offense arose out of all the transactions.

■ If it has ever been the rule in this state that when one sets out to maim or murder another gradually through a series of acts the prosecution is required to elect and rely upon only one of the acts to obtain a conviction, it is no longer the rule. We hold that the court did not err in refusing to require the State to elect among the transactions involving radiation exposure.

Appellant complains that the trial court erred in permitting the State to bolster the testimony of Kirk Crocker. In this connection, appellant raises four contentions: 1) the testimony given by Dr. Richard Pesikoff concerning Kirk's truthfulness constituted improper bolstering because Kirk had not been impeached; 2) this testimony was improper even if Kirk had been impeached because Kirk's reputation for truth and veracity had not been challenged; 3) the testimony was improperly given in the form of a personal opinion; 4) and psychiatric testimony is not available to bolster the testimony of another.

Dr. Pesikoff was an assistant professor of psychiatry at Baylor Medical School and was practicing as an adult and child psychiatrist. He testified for the State that he was a consultant for the Texas Childrens' Hospital in 1973 and that his role there was to provide assistance as a child psychiatrist "whenever there appears to be emotional difficulties involved in the patient's pathol-

ogy. . . ." In March of that year Dr. Pesikoff was asked to assist in the diagnosis and treatment of Kirk Crocker. At that time the cause of Kirk's injuries was unknown. Dr. Pesikoff's initial diagnosis of neurodermatitis, a rash condition precipitated by anxiety, followed his mental status evaluation of Kirk to determine whether Kirk's problems were emotional in nature or whether there was an external etiology. After explaining how he conducted this evaluation, Dr. Pesikoff testified that the original diagnosis was incorrect.

Relying upon his notes, Dr. Pesikoff stated what Kirk had told him regarding the incidents of radiation exposure. Dr. Pesikoff then testified as follows:

"Q. All right, sir. Now, Dr. Pesikoff, as a part of a psychiatrist's evaluation of a patient, and let's take here a child patient, is the quality of truthfulness a part and a necessary element of reaching a diagnosis and evaluation of such a patient?

"A. It is something that we seek to ascertain during an evaluation, yes, sir.

" * * *

"Q. (By Mr. Hinton) Did you seek to ascertain this element of the quality for truthfulness as a part of your diagnosis and evaluation, Doctor?

"A. Yes, sir, I did. Part of a mental status evaluation is to ascertain as best we can whether or not a patient is truthful. The reason for trying to ascertain that is that if the patient is lying, there are numbers of reasons why patients lie. Some patients are dishonest people. We might call them the antisocial character. That is the most common. The child criminal, the juvenile delinquent. If you are looking to diagnose a child as an antisocial character, one of the findings would be lying. But you would also look for seven or eight other findings when you do an evaluation. You look for stealing, sexual acting out, drug abuse, running away from home, fighting, so on and so forth. The criteria that I quoted are the standard criteria taken from a book called *Deviate Children* by Robbins. The sequel to that is *Deviant Children Grow Up.* If you find eight of these qualities in a child when you do an evaluation, you can be pretty sure, if the child is more than eight years old, that this child has about four out of five chances of being a delinquent when he is a teenager. Therefore, ascertaining lying would be important. There are five or six other diagnoses. When I give a lecture on lying at Baylor, what we try to do is take the word lying and then look at the different kinds of psychiatric diagnoses in which you find it. The one I mentioned is the sociopath, the antisocial character, the criminal. The others being schizophrenic, there is Munchausen syndrome, there are others which I don't think we need to go into.

"Q. That last syndrome. Would you spell that?

"A. M-u-n-c-h-a-u-s-e-n. It's a German name. Dr. Munchausen was kind of a Paul Bunyon. He told stories, and they were exaggerations. There are others.

"Q. In your interviews with Kirk were you able to reach an opinion as to that quality of truthfulness in this patient?

"A. Yes, sir, I was. Kirk not only does not have lying present, he has none of the other qualities that I look for when I am trying to diagnose a sociopathic character, the ones I named. They are lacking in the evaluation of Kirk."

Appellant's objection to this testimony on the grounds that it constituted improper bolstering and invaded the province of the jury was overruled.

While discussing his psychological evaluation of Kirk, Dr. Pesikoff testified that Kirk "appeared to be a very honest boy." Previously, Dr. Leon Librick had testified on direct examination as follows:

"Q. And did you feel—can you tell us whether or not in your opinion when you took this history from Kirk concerning pellets and what have you he was being truthful with you, Dr. Librick?

"A. Yes, in my own opinion he was telling the truth."

 Appellant made no objection to either of these references to Kirk's truthfulness. It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged. *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Watson v. State*, 532 S.W.2d 619 (Tex.Cr. App.1976). For this reason we need not discuss the admissibility of Dr. Pesikoff's testimony.

Relying on *Parker v. Employers Mutual Liability Insurance Company of Wisconsin*, 440 S.W.2d 43 (Tex.1969), appellant contends that the evidence is insufficient to show causation. In *Parker*, the plaintiff brought suit against his employer's insurer to recover for disability he alleged was caused by his employment. After a jury verdict the trial court rendered judgment in favor of the plaintiff for total and permanent disability due to a cancer caused by exposure to radioactive materials in the course of his employment. The San Antonio Court of Civil Appeals reversed and rendered judgment on the grounds that there was no evidence of a causal connection between the plaintiff's exposure to radiation and his subsequent development of cancer. 418 S.W.2d 570. Affirming the judgment of the Court of Civil Appeals, the Texas Supreme Court held that expert medical testimony will support the submission of a workmen's compensation case to the jury if the testimony shows a "reasonable probability" of a causal connection between an act and a present injury. The Court stated, however, that "reasonable medical probability" can be based upon the evidence as a whole and, thus, particular terms or phrases from the medical experts

are not necessary to create a probability. *Accord, Insurance Company of North America v. Myers*, 411 S.W.2d 710 (Tex. 1967).

None of the expert medical witnesses in the present case stated that in "reasonable medical probability" Kirk's exposure to radioactive materials caused injuries which ultimately deprived him of a testicle. Thus, assuming that the causation standard articulated in the civil case is applicable here, the question before us is whether the evidence as a whole shows in "reasonable medical probability" causal connection between the radiation exposure and Kirk's loss of a testicle.

The expert testimony was to the effect that the etiology of Kirk's injuries was exposure to radiation. Dr. Thomas Cronin, a plastic surgeon, testified that he had initially examined Kirk in December of 1973 at the request of another doctor. Dr. Cronin stated that the State's fourth through twenty-second exhibits were photographs taken under his direction and control which accurately showed the existence of numerous disfiguring ulcers and wounds on certain parts of Kirk's body. The fifth exhibit showed necrotic ulcers on and between the thighs and on the scrotum. Dr. Cronin's diagnosis was radiation necrosis, a condition caused by exposure to radioactive materials and characterized by blistering, ulceration and eventual scarring. Referring specifically to Kirk's injuries, Dr. Cronin stated that he knew of "nothing else that will cause this type of ulcer."

Radiation necrosis, according to the doctor, develops progressively over a period of time. Necrotic tissue is dead tissue which "is just still lying attached to the body and will have to be removed or will slough off itself."

Dr. Cronin further testified that Kirk's testicles had been exposed to radiation and that Kirk's scrotum had been damaged. On cross-examination defense counsel inquired whether Kirk could have been suffering from factitial dermatitis (self-inflicted skin injury) or whether his lesions could have been caused by unconscious scratching. Dr.

Cronin rejected these theories and indicated on redirect that acceptance of them would require him to conclude that Kirk had scratched out his testicles.

Dr. Vincent Collins, a physician and radiotherapist, testified that he had treated many industrial and medical injuries resulting from exposure to radiation. He examined Kirk in February of 1974 and concluded that the boy was suffering from chronic radiation ulcers. Dr. Collins stated that radiation-induced injuries may develop over a long period of time, but this is dependent upon the intensity of the radiation and the duration of each exposure. The doctor further stated that in his opinion a certain amount of radiation could destroy an individual's testes and that Kirk had been deprived of the function of both of his testes.

Dr. Thomas Guthrie testified that he was a pediatric urologist and that he had published many papers in his field. He performed a testicular biopsy on Kirk on January 21, 1974, and found no testicle on the right side of the scrotum. Dr. Guthrie concluded that the scrotum had been abscessed and that as a result the right testicle had "sloughed out." He stated that all that remained on the right side of the scrotum was a soft mass of tissue and that on the left side "there was a small hard testicular body that did not feel normal."

When asked whether he had an opinion as to whether or not an individual's testes could be destroyed by radiation, Dr. Guthrie's response in essence was that an opinion on this matter would involve supposition because he had never encountered another case like this one. He stated, however, that biopsy reports by the pathologist at Texas Childrens' Hospital and by the Armed Forces Institute of Pathology (AFIP) in Washington, D.C., indicated that Kirk's pathology was consistent with a radiation-induced condition. Dr. Guthrie later read the AFIP reports into the record. In summary, these reports stated that the biopsy of the testes in this case showed some changes which were compatible with radiation damage but which were non-specific and, thus, that a definitive diagnosis of radiation dam-

age could not be made. In any case, Dr. Guthrie was convinced that Kirk possessed only one testicle and that the other was incapable of producing hormones or sperm.

Endocrinology is the field of medicine dealing with the glands of internal secretion. Dr. Leon Librick, a pediatric endocrinologist, testified that Kirk had two testicles when he examined the boy in August of 1974, but that Kirk was functionally castrate because the testes could not produce testerone, the male hormone, or make sperm cells.

Dr. Mary Gaulden, an associate professor of radiology at Southwestern Medical School in Dallas, and a cytologist, geneticist, and radiobiologist, testified that she conducted a chromosome analysis of Kirk's blood and skin cells. This analysis revealed certain chromosomal aberrations that indicated Kirk had been exposed to radiation. From the tests she conducted and the photographs showing Kirk's injuries, Dr. Gaulden concluded that radiation was the sole cause of the injuries.

Dr. Carl Tessmer, a radiation pathologist and Chief of Laboratory Services at the Veterans Administration Hospital in Temple, stated that he had examined tissue removed from Kirk's thighs and scrotum. There were "clear findings" that this tissue was damaged by radiation. Dr. Tessmer ambiguously testified, however, that while the "gross pictures" were consistent with his diagnosis of radiation effect, he "would not myself make an unquestioned statement about radiation being the cause of this gross lesion."

Although Dr. Tessmer never personally examined Kirk's testicular tissue, he did review the AFIP reports concerning the testicular biopsy. Dr. Tessmer stated that these reports confirmed his own findings and did not suggest any causation other than exposure to radiation, but his testimony on cross-examination was more cautious:

"Q. (By Mr. James) I'm sorry, I am getting to the point where I am not even sure I will restate it the same way. Pardon me if I don't. Are the things that we have found in

here, then, can we say that each one of them that we have located is a thing that might be compatible with radiation, would those same things be compatible with other injuries, diseases, whatever?

"A. Yes. And I think we have already stated that by saying that this is not a definitive diagnosis, or doesn't establish definitively that this is radiation damage."

Dr. Deanna Emerson, a specialist in child and adolescent psychiatry, testified that Kirk could be suffering from a psychophysiological disorder and that the lesions could have been caused by a complex of emotional factors. She further testified, however, that she had never examined Kirk and was not familiar with his medical history or of the sequence of events which occurred in this case.

Dr. William Duncan, a dermatologist and one of the treating physicians, testified that Kirk was not suffering from neurodermatitis, factitial dermatitis or from a viral disorder. Dr. Duncan's diagnosis was radiation necrosis.

■ When viewed as a whole and in the light most favorable to the verdict, the substance of the expert testimony established in reasonable medical probability a causal connection between appellant's acts of exposing Kirk to radiation and the physical deprivation of Kirk's right testis, and further strongly established a causal connection between the acts and the functional castration of the other testis. Therefore, we hold that the evidence is sufficient to show causation.

Appellant contends that the evidence is insufficient to show that Kirk possessed both testes prior to his exposure to radiation. In this connection, during the testicular biopsy he performed on Kirk in January of 1974, Dr. Guthrie encountered no testis on the right side of the scrotum but found instead a fatty tissue that forms during the healing process to replace absent tissue. After the biopsy was completed Kirk told Dr. Guthrie that he had had both testes prior to the onset of his illness.

■ This declaration with regard to Kirk's past bodily condition was admissible as an exception to the hearsay rule and thus had probative value. This exception is discussed in 1 McCormick & Ray, *Texas Evidence* § 842 (2d ed. 1956), as follows:

"One of the reasons that special reliability is attributed to declarations as to bodily condition is that descriptions of present sensations of the declarant usually have a vividness and sincerity not found in out-of-court declarations generally. This reason in terms is inapplicable to declarations describing bodily states as of a time previous to the declarations and such declarations are inadmissible with the single exception to be mentioned. Where the statements as to past pain, symptoms or other bodily condition are made to a physician upon whom the declarant is calling for treatment which he knows will be based largely upon the statements, the elements of spontaneity which the reaction from present pain, etc., affords is absent, but there is a practical motive for truth telling which gives unusual credibility to the statements—desire for the right sort of treatment. For this reason under the better view declarations of a patient to his doctor made for purposes of treatment, as to past pain, sensations, and symptoms are admissible by way of exception. (Footnotes omitted).

■ Dr. Guthrie testified that a healthy male would, of course, have two testicles. This testimony, in conjunction with Kirk's statement regarding this matter, is sufficient to show that Kirk had both testes prior to his exposure to radiation.

Appellant next contends that a fatal evidence exists between the allegations in the indictment that the amount of radioactive material was unknown and the proof thereof.

■ It was alleged in the indictment that appellant had exposed Kirk to radioactive material "in a quantity to the Grand Jury unknown." Ira Bryant, foreman of

the grand jury, testified at trial that the jury did not know the quantity of the radioactive material involved. If the evidence shows, however, that the grand jury could have ascertained the quantity by reasonable diligence, then there would be such a variance. *Jordan v. State,* 520 S.W.2d 388 (Tex. Cr.App.1975); *Payne v. State,* 487 S.W.2d 71 (Tex.Cr.App.1972).

There is no evidence in the record of the exact quantity of radioactive material to which Kirk was exposed. It is clear that this quantity varied from the amount of radioactive material that appellant was authorized to possess. Although appellant was permitted to possess only one radioactive source until August 2, 1972, Kirk testified that he was exposed to two radioactive sources on two different occasions during the preceding four months. Further, Kirk was exposed to three radioactive sources on one occasion in July of 1972 even though appellant was never licensed to possess that many substances.

Furthermore, it was never established whether the radioactive materials used by appellant to injure Kirk were one-curie or two-curie sources. Thus, the intensity of the radiation to which Kirk had been exposed was not known.

 Since the exact quantity and strength of the radioactive sources were never established, we cannot conclude that the grand jury failed to exercise reasonable diligence to determine that quantity. Under these unique circumstances insofar as the means used to commit the offense are concerned, we hold that the evidence was consistent with the allegations in the indictment.

 Appellant's contention that the State failed to prove venue in Harris County is without merit. He did not raise this issue in the trial court. Thus, we must presume that proper venue was proved. Article 44.24, V.A.C.C.P. Moreover, the record discloses that four of the five incidents of irradiation occurred at appellant's apartment in Houston, Harris County.

Appellant contends that he was denied his constitutional right to due process because there was no evidentiary basis for the indictment returned by the grand jury in this cause. When this issue was raised in the trial court by appellant's motion to quash the indictment, the prosecutor stipulated that he had presented the case to the grand jury "based upon information that was received from various sources and investigation conducted by us and other agencies, and there were no witnesses."

 In *Lee v. State,* 66 Tex.Cr.R. 567, 148 S.W. 567, 568 (1912), this Court held that the motion to quash the indictment was properly denied even though that indictment "was found by the grand jury without witnesses or testimony before them upon which to predicate such finding." Further, it is well established that an indictment returned by a legally constituted unbiased grand jury, if valid on its face, is sufficient to mandate trial of the charge on the merits. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Forbes v. State,* 513 S.W.2d 72 (Tex.Cr.App. 1974), *cert. denied* 420 U.S. 910, 95 S.Ct. 830, 42 L.Ed.2d 840 (1975). No deprivation of due process has been shown.

Appellant, complaining of certain hypothetical questions propounded by the prosecutor to two of the State's witnesses, argues that the witnesses' responses "tended to prove by innuendo what the State could not prove by direct evidence."

James Gorrell and Ed Bailey, the witnesses, were each asked whether a person licensed to possess one radioactive source of a certain strength could purchase that source from one manufacturer and then purchase an additional source from another manufacturer by reusing the same license, and whether a person licensed to possess radioactive sources in one state could use the license to obtain sources in another state. Bailey was also asked whether a person licensed to possess radioactive sources could borrow additional sources from another person so licensed. Each question was answered affirmatively.

Kirk's testimony showed that he had been exposed on several occasions to a greater number of radioactive sources than appellant was authorized to possess. The obvious purpose of the hypothetical questions was to demonstrate that appellant could have obtained additional sources without authorization.

■■■ As a threshold matter, the record before us reveals that appellant failed to preserve error relative to each hypothetical question he is challenging. The bases for the objections to the hypothetical inquiries posed to witness Gorrell were that no predicate had been established for the first inquiry and that the second inquiry was irrelevant. The contention on appeal is that the responses to these questions tended to prove circumstantially what the State was required to prove by direct evidence. It is well settled that the ground of error presented on appeal must comport with the objection raised at trial; otherwise, nothing is presented for review. *Hughes v. State,* 562 S.W.2d 857 (Tex.Cr.App.1978); *Graham v. State,* 546 S.W.2d 605 (Tex.Cr.App.1977). Furthermore, appellant made no objection whatsoever to any of the hypothetical questions directed to witness Bailey. It is axiomatic that error related to the examination of witnesses or to the admission of evidence is not preserved for appellant review absent a timely objection at trial. *Lejeune v. State,* 538 S.W.2d 775 (Tex.Cr.App.1976); *Thomas v. State,* 530 S.W.2d 834 (Tex.Cr. App.1975).

Moreover, appellant argues the old rule that circumstantial evidence is not admissible to prove a fact when direct evidence relative to that fact is available. That rule was repudiated long ago. *Vasquez v. State,* 145 Tex.Cr.R. 376, 167 S.W.2d 1030 (1943), and authorities cited therein.

Appellant next contends that the court erred in denying the motion to quash the second, third and fourth counts of the indictment. The thrust of his argument is that Article 1148, V.A.P.C. (1925) (inten-tional infliction of physical injury on child 14 years of age or younger) was a special statute concerning the same subject matter and controlled over the general statutes which defined the offenses charged in these counts.

■■■ We observe initially that appellant was charged in the fourth count with assault with intent to maim under Article 1159, V.A.P.C. (1925), and not, as he suggests, with the offense of maiming under Article 1166, V.A.P.C. (1925). More importantly, no harm is shown with respect to the court's denial of the motion to quash this count because the State abandoned the count after all the testimony was presented and before the case was submitted to the jury. The doctrine of double jeopardy bars any subsequent prosecution for assault with intent to maim. *Ex parte Scelles,* 511 S.W.2d 300 (Tex.Cr.App.1974); *Parish v. State,* 145 Tex.Cr.R. 117, 165 S.W.2d 748 (1921).

■■■ Similarly, no harm is shown in connection with the denial of the motion to quash the disfiguring count of the indictment. The jury's decision to convict appellant on the castration count amounts to a de facto acquittal of the offense of disfiguring.

The question becomes, therefore, whether the existence of Article 1148a should have precluded appellant's conviction for castration.

Article 1168 provided:

"Whoever wilfully and maliciously deprives any person of either or both or any part of either or both of the testicles shall be confined in the penitentiary not less than five nor more than fifteen years."

Article 1148a provided, in part:[2]

"(a) No person or parent of a child may intentionally maim, disfigure, or batter a child who is 14 years of age or younger or engage in conduct which by omission or commission is

---

**2.** This article was repealed by Acts 1973, 63rd Leg., ch. 399, sec. 3(a), p. 991, effective January 1, 1974.

intended to cause physical injury to, or deformity or deficiency in, a child who is 14 years of age or younger.

"(b) Any person who violates Subsection (a) of this section is guilty of a felony and upon conviction is punishable by imprisonment in the State penitentiary for a period of not less than two years nor more than five years."

It is clear that the two statutes concern to some extent the same subject matter and have the same general purpose. The State argues that these statutes must be considered as being in pari materia although they contain no reference to one another and were not enacted simultaneously, and that they are complementary, not conflicting. The in pari materia doctrine is discussed in 53 Tex.Jur.2d *Statutes* § 186 (1964), as follows:

"It is a settled rule of statutory interpretation that statutes that deal with the same general subject, have the same general purpose, or relate to the same person or thing or class of persons or things, are considered as being in pari materia though they contain no reference to one another, and though they were passed at different times or at different sessions of the legislature.

"In order to arrive at a proper construction of a statute, and determine the exact legislative intent, all acts and parts of acts in pari materia will, therefore, be taken, read, and construed together, each enactment in reference to the other, as though they were parts of one and the same law. Any conflict between their provisions will be harmonized, if possible, and effect will be given to all the provisions of each act if they can be made to stand together and have concurrent efficacy.

"The purpose of the in pari materia rule of construction is to carry out the full legislative intent, by giving effect to all laws and provisions bearing on the same subject. The rule proceeds on the supposition that several statutes relating to one subject are governed by one spirit

and policy, and are intended to be consistent and harmonious in their several parts and provisions. Thus, it applies where one statute deals with a subject in comprehensive terms and another deals with a portion of the same subject in a more definite way. But where a general statute and a more detailed enactment are in conflict, the latter will prevail, regardless of whether it was passed prior or subsequently to the general statute, unless it appears that the legislature intended to make the general act controlling. And, the rule is not applicable to enactments that cover different situations and that were apparently not intended to be considered together." (Footnotes omitted). *Accord, Moore v. State,* 545 S.W.2d 140 (Tex.Cr.App.1977) (dissenting opinion on motion for rehearing); *Ex parte Harrell,* 542 S.W.2d 169 (Tex.Cr.App.1976).

We find no evidence of a legislative intent to supercede or repeal the more specific offense of castration as it applied to children. Having determined that effect must be given to the provisions of each statute so that they stand together and have concurrent efficacy, we hold that the existence of Article 1148a did not bar appellant's conviction under Article 1168.

Despite appellant's objection the judge instructed the jury not to draw an inference of guilt from the fact that appellant had been arrested, confined, or indicted. Appellant maintains that he was harmed by this instruction because there was no evidence that he had been confined in any type of institution.

The judge in this case decided to give the protective instruction in appellant's interest. A determination that appellant was harmed would require us to speculatively assume that the jurors totally disregarded the instruction and attached great weight to what they had been told not to consider at all. *See and compare Lakeside v. Oregon,* 435 U.S. 333, 98 S.Ct. 1091, 55 L.Ed.2d 319 (1978). The jurisprudence of this state cannot rest on dubious assumptions.

■ Moreover, when evaluating the charge we will not consider isolated statements which in themselves appear to be prejudicial but will view the charge as a whole. *Smith v. State,* 541 S.W.2d 831 (Tex.Cr.App.1976); *Bailey v. State,* 532 S.W.2d 316 (Tex.Cr.App.1976). We find that the charge in its entirety correctly explained the presumption of innocence and contained no comment on the weight of the evidence nor otherwise harmed appellant.

■ Appellant's final contention is that the State was required to prove each element of this circumstantial evidence case to a "moral certainty" and that the trial court erred in failing to apply this standard to the facts throughout the charge. This contention is without merit.

Whether the State is relying upon circumstantial or direct evidence, it is required to prove each element of its case beyond a reasonable doubt and not to a "moral certainty."

No reversible error is shown. The judgment is affirmed.

ODOM, J., concurs in the result.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

ODOM, Judge.

■ Motion for leave to file motion for rehearing was granted in this case to address the standard of proof on the sufficiency of the evidence to prove causation. The constitutionally required burden of proof in criminal cases is that the State establish all elements of the offense beyond a reasonable doubt. See, Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d (1970). We disavow the language in our opinion on original submission that addressed the sufficiency of the evidence to prove causation in terms of "reasonable medical probability." That term has no role to play in the law of burden of proof in criminal cases. From the evidence set out in the opinion on original submission, we hold the issue was proven beyond a reasonable doubt.

Appellant's motion for rehearing is overruled.

DOUGLAS, Judge, concurring.

The appellant's motion for rehearing should be overruled for the reasons stated in the opinion on original submission. Usually, in a case such as this, expert witnesses will not testify that an injury was caused by any particular means beyond a reasonable doubt. The test for the admission of such testimony set out in the original opinion should be all that is required for the proof of causation. The statement in the opinion on rehearing that the cause of the injury was proved beyond a reasonable doubt does not add anything to the opinion evidence of the experts. The proof is not elevated by such a statement to any higher degree than the test for its admission.

The State proved the entire case beyond a reasonable doubt including opinion evidence by the cause of injury to a reasonable medical probability.