TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




 
 

ON MOTION FOR REHEARING


 





NO. 03-00-00777-CR







James Ray Hill, Appellant 


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT,


NO. 99-4600, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING







 We withdraw our opinion and judgment dated October 11, 2001 and substitute the
following opinion and judgment.

 A jury found James Ray Hill guilty of the offense of delivery of less than one gram
of cocaine. See Tex. Health & Safety Code Ann. § 481.112(b) (West Supp. 2001). After finding
that Hill previously had been convicted of two felonies, the district court assessed punishment at
seven years in prison. In eight points of error, Hill contends that the district court erred during the
guilt-innocence phase by admitting particular portions of testimony, not requiring the court reporter
to record some portions of the proceedings, and answering questions from the jury incorrectly, and
erred during the punishment phase by admitting certain exhibits. We affirm the judgment.


BACKGROUND


 Testimony at the guilt-innocence phase came from three Austin police officers and
two chemists. Austin police detective Vincent Hernandez testified about his activities in the
undercover drug purchase that led to Hill's arrest. Hernandez testified that he prepared for the
undercover drug transaction by photocopying a twenty-dollar bill and writing down its serial number.
He then drove to an area of Austin known to be an "open-air drug market" where crack cocaine was
sold. Hernandez testified that he made eye contact with one man who gave something to another
man later identified as Hill. Hill approached the car and asked what Hernandez needed. Hernandez
replied that he wanted "a twenty," which is slang for twenty dollars worth of crack cocaine. 
Hernandez testified that Hill leaned into the window and gave him a rock of crack cocaine. 
Hernandez gave Hill the twenty-dollar bill he had photocopied earlier, then drove away and notified
a group of nearby officers to arrest Hill.

 Austin police detective Robin Orten testified that he was part of the group of officers
who arrested Hill based on a description given to them by another detective. At trial, Orten
identified Hill as the man he arrested. Orten testified that, after other officers took Hill to the ground
to secure him, Orten saw a twenty-dollar bill lying next to Hill's body, close to his hands and pocket. 
Orten picked up the twenty-dollar bill and took it to Hernandez.

 Austin police chemists Tony Arnold and Ralph Owen testified regarding the
recovered cocaine rock. Both testified about the chain of custody for the cocaine rock as well as
their experience testing cocaine and the general characteristics of powdered cocaine and crack
cocaine. Owen testified that the rock Hill sold Hernandez tested to be 0.16 grams of cocaine.


DISCUSSION


 By points of error one and two, Hill contends that the district court erred at the guilt-innocence phase of trial by admitting evidence on the process of converting powdered cocaine into
crack cocaine and the resultant increase in volume and profit reaped. Hill contends the admission
of this evidence was error because it was irrelevant and was evidence of other crimes, wrongs or acts
which were admitted in order to show his character and that he acted in conformity with that
character. See Tex. R. Evid. 401, 402, 404(b). Hill complains specifically of an exchange that
occurred during Detective Hernandez's testimony.

 The State's examination of Hernandez began with Hernandez describing the scene
of the arrest as an open-air drug market with a large number of customers. The defense objected to
the relevance of a question regarding whether Hernandez knew how "they" process cocaine into rock
form rather than powder. The court overruled that objection as well as an objection to the officer's
expertise on that subject. The court sustained an objection to testimony regarding how cocaine
affects the community. The following exchange then occurred:


[Prosecutor]: Now, sir, from your experience and from your training, can you
please explain the difference between powder cocaine and crack
cocaine?


[Defense counsel]: Judge, again, she hasn't established that [Hernandez] has the
expertise to make that distinction, number one. Number two,
it is not relevant to any issue in this case, and I object for those
reasons.


The Court: Overruled.


[Prosecutor]: Q. You can go ahead and answer that question, sir.


[Hernandez]: A. Repeat the question please.


Q. Earlier you said that there was a difference between crack cocaine and powder
cocaine. One was a solid form. Could you explain how cocaine is made into
crack cocaine?


A. What you do is you take powder cocaine. Say, for example, I have an ounce in
my hand. If I want to turn it into crack, what I will do is I will use what we refer
to as cut, which is a dilutant of some type. Usually--it could be anything from
baking soda to Vitablend, which is a name brand of vitamin B powder that you
can purchase at nutrition stores. 


 Whatever I decide to use as cut, I will say take my ounce of powder cocaine, cut
it and get a quarter of that ounce, mix it with whatever dilutant I am going to
use. It is as simple as putting it in a lab beaker, mixing it up, popping it into the
microwave and letting it cook. As the water evaporates in the beaker itself, what
I am left with is a small cookie, what we refer to as a cookie because it looks just
like a cookie. That is your crack cocaine.


 It is an adulterated powder cocaine is what it is, and now it is in a solid form, so
now from a quarter ounce of powder cocaine, I now have one ounce of crack
cocaine. I will take that one ounce of crack cocaine and I will cut it up into
individual rocks, so you can see where the profit is, you know, in making your
powder cocaine into crack cocaine.


Q. Go ahead, I'm sorry.


A. And so that is basically what you do. You use cut, mix it with your powder and
cook it, and then you have your crack cocaine.


Q. So in other words, you get, by cooking this cocaine, you get more
cocaine--more usable cocaine than if you leave it in powder form?


A. What you do is you actually increase the volume of your product with an
investment of say a thousand dollars for an ounce of powder cocaine, and I
could cook, you know, just depends on how much I want to dilute it, how strong
it is. If you want stronger crack, I put more cocaine in as I cook it. If I want
weaker, I will take less powder cocaine and make more cookies. You are
increasing your profit. It is a huge profit on it.



Hernandez then made statements about smoking crack and intravenous ingestion. Interspersed were
sustained objections to nonresponsive answers and the irrelevance of questions about whether the
arrest site was part of the department's weed-and-seed program. The State's examination of
Hernandez continued into why the site was chosen for the undercover operation and then moved on
to the specifics of Hill's delivery of cocaine.

 Hill contends in point one that the portion of Hernandez's testimony regarding the
making of crack cocaine and its profits were not relevant to whether he delivered less than a gram
of cocaine. We review the trial court's decision to admit or exclude evidence under an abuse of
discretion standard. See Green v. State, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996);
Montgomery v. State, 810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990). We will not reverse a trial
court whose ruling was within the "zone of reasonable disagreement." Green, 934 S.W.2d at 102; 
Montgomery, 810 S.W.2d at 391 (opinion on reh'g). Evidence is relevant if it has any tendency to
make the existence of any fact that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Evidence that
is not relevant is not admissible. Id. R. 402.

 Testimony about phases of the drug trade not relevant to the offense charged can be
improper and harmful. See Contreras v. State, 846 S.W.2d 48, 49 (Tex. App.--Corpus Christi 1993,
pet. ref'd). In Contreras, the defendant pleaded guilty to possession of slightly over twenty-eight
grams of cocaine. At the punishment phase of trial, a State witness testified over objection regarding
the drug trade, including tracing hypothetical cocaine from the importers to the kilo dealers and
finally to the ounce dealers like the defendant. Id. The witness testified that dealers could take an
ounce of cocaine worth $2000, cut it, and resell it for $14,000. Id. Rejecting the State's argument
that the evidence lent perspective to the defendant's place in the drug trade continuum and thus what
his punishment should be, the Contreras court held that this testimony was speculative, irrelevant,
a reference to extraneous offenses, and an attempt to link the defendant with drug importers and
dealers. Id. at 50.

 We conclude that Hernandez's testimony was not subject to the same defects and
appellate challenges that were present in Contreras. Unlike the testimony in Contreras, which
surveyed the drug trade, the objected-to question in this case inquired only about the nature of the
substance Hill was charged with delivering. The State is entitled to elicit information regarding the
facts and circumstances surrounding the commission of the offense. Wilkerson v. State, 736 S.W.2d
656, 661 (Tex. Crim. App. 1987). Hernandez did not insinuate that Hill had prepared the crack;
rather, Hernandez used the pronouns "I" and "you" rather than "he." Hill complains that this
testimony was unavoidably linked to him because Hernandez had not indicated the involvement of
any other persons besides Hill and his companion, but that argument ignores Hernandez's previous
and subsequent references to a "high volume" of drug sales at "an open-air drug market" involving
"individuals who are selling smaller quantities of cocaine." This testimony definitely indicates that
people other than Hill and his companion were involved in the drug trade. Hernandez's testimony
explained to the jury why the cocaine was solid rather than powdered.

 Even if the court erred by overruling the objection to the question to Hernandez, Hill
failed to preserve error by failing to object later in the trial to a question and testimony regarding the
difference between powder cocaine and crack cocaine. See Hudson v. State, 675 S.W.2d 507, 511
(Tex. Crim. App. 1984); Crocker v. State, 573 S.W.2d 190, 201 (Tex. Crim. App. 1978). Austin
police chemist Owen testified that adulterants and dilutants were substances added to controlled
substances to increase the bulk of the controlled substance. Without objection, the State asked,
"What sort of dilutants do you commonly see or are you commonly aware of that are used in Austin
with cocaine?" Owen responded that sugars, topical anesthetics, and baking soda are commonly
used to dilute cocaine. Owen also stated that baking soda "is used in the process of converting
[powdered] cocaine into crack cocaine." One question later, the State asked, "Can you explain just
briefly what the difference is between powder cocaine and crack cocaine?" Owen responded:


 Well, crack cocaine is a very highly addictive form of cocaine. It is smoked. It is not
water soluble. You put it in a crack pipe. The typical crack pipe is a little tube, glass
tube, put a brillo pad in it, it is heated up with a lighter and it is--the--as the rock is
heated into a vapor, it is inhaled directly into the lungs, and it immediately
affects--goes from the lungs to the blood to the brain and it is an immediate effect
and highly addictive and fast-acting, whereas the regular cocaine, cocaine
hydrochloride is a salt. It is water soluble, a salt. It can be inhaled through the nose
or injected, but crack cocaine being not water soluble, you wouldn't want to inject
it or inhale it.


Owen thus confirmed that cocaine is bulked by dilutants and converted into crack, that crack is a
solid form of cocaine rather than a powder, that crack is in the form of rocks, and that crack is highly
addictive.

 The district court's overruling of Hill's objection applied only to the question and
testimony regarding the difference between powder and crack cocaine. The officer's testimony that
crack cocaine generated a huge profit was not responsive to the question regarding the difference
between the two, but there was no objection to the profit testimony and no motion to strike. Error
was waived as to this portion of testimony that exceeded the scope of the overruled objection to the
question regarding the difference between powder and crack cocaine. See Tex. R. App. P. 33.1.(a);
Brimage v. State, 918 S.W.2d 466, 504 (Tex. Crim. App. 1994). We overrule point one.

 By point two, Hill contends that Hernandez's testimony about the difference between
powder and crack cocaine was evidence of other crimes, wrongs, or acts introduced to prove the
character of the defendant in order to show conformity with that character; he contends it was
therefore inadmissible under Texas Rule of Evidence 404(b). He challenges the same testimony as
under point one; his challenge therefore suffers from the same preservation difficulties borne of the
failure to object to subsequent offerings of the evidence or to request excision of testimony not
responsive to the questions asked. Even if the asserted error was preserved, we conclude that Hill
does not show an abuse of discretion under Rule 404(b). Courts have held that Rule 404(b) does not
exclude evidence of other crimes, wrongs, or acts committed by persons other than the defendant. 
See McKay v. State, 707 S.W.2d 23, 31-32 (Tex. Crim. App. 1985); Mayo v. State, 17 S.W.3d 291,
299 (Tex. App.--Fort Worth 2000, pet. ref'd). The Waco court of appeals interpreted Rule 404(b)
more broadly to make inadmissible evidence of acts committed by persons other than the defendant
that show the character of the defendant to commit the offense charged. Castaldo v. State, 32
S.W.3d 413, 420-21 (Tex. App.--Waco 2000, pet. granted). As discussed above, the district court
reasonably could have found no implication in the testimony regarding the difference between crack
cocaine and powder cocaine that Hill manufactured crack, profited immensely from the conversion
to crack, or was responsible for the bustling open-air drug market. The district court reasonably
could have concluded that evidence of the character of the cocaine does not relate to Hill's character
or whether he acted in conformity with his character in participating in the sale of crack. Under
either interpretation of Rule 404(b), the district court did not abuse its discretion by finding the
evidence admissible. We overrule point two.

 By points of error three and four, Hill contends that the district court erred by not
having the court reporter record and transcribe all proceedings during trial, including proceedings
regarding notes from the jury during its deliberations. The court reporter is required to make a full
record of the proceedings unless excused by agreement of the parties. Tex. R. App. P. 13.1(a). No
such agreement is apparent. Hill argues that the reporter's duty to record proceedings is mandatory
and that noncompliance is automatically reversible, citing Tanguma v. State 47 S.W.3d 663, 667
(Tex. App.--Corpus Christi 2001, no pet. h.). He also cites a case in which this court stated that,
when responding to questions from the jury during deliberations, a trial court's noncompliance with
its statutorily prescribed duties was, in general, reversible error. Brooks v. State, 967 S.W.2d 946,
949-50 (Tex. App.--Austin 1998, no pet.) (discussing duties under Tex. Code Crim. Proc. Ann. art.
36.27 (West 1981)). Hill contends that he can show harm, if necessary.

 We conclude that a defendant must show some harm to gain reversal for the failure
of a court reporter to record bench conferences. Though in Brooks we held that the district court's
duties under article 36.27 were mandatory, we also held that the failure to object to the court's failure
to perform those duties limited the appellate court to reversing only if the defendant showed
egregious harm. Id. at 950; see also Rogers v. State, 38 S.W.3d 725, 729 (Tex. App.--Texarkana
2001, pet. ref'd). Egregious harm is harm so great that it denied the defendant a fair and impartial
trial. Brooks, 967 S.W.2d at 950 (citing Skinner v. State, 956 S.W.2d 532, 544 (Tex. Crim.
App.1997); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Errors
that result in egregious harm are those that affect the essential dispute in a case or disturb the basis
of the defensive theory. Almanza, 686 S.W.2d at 172; see also Hutch v. State, 922 S.W.2d 166, 171
(Tex. Crim. App. 1996). Similarly, the Corpus Christi court of appeals concluded in Tanguma that
a failure to record bench conferences does not automatically result in reversal. See Tanguma, 47
S.W.3d at 667. That court reviewed for errors affecting constitutional and substantial non-constitutional rights. Id. at 674-77; see also Tex. R. App. P. 44.2. An error that directly offends
against the United States or Texas Constitution, without regard to any statute or rule that might also
apply, and is subject to harmless error review requires reversal unless the appellate court determines
beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tate
v. State, 988 S.W.2d 887, 890 (Tex. App.--Austin 1999, pet. ref'd). Regarding non-constitutional
errors, a substantial right is affected when the error had a substantial and injurious effect or influence
in determining the jury's verdict; we will not overturn a criminal conviction if a review of the record
as a whole assures us that the error did not influence the jury, or had but a slight effect. Id. at 890.

 Hill complains of five unrecorded bench conferences: (a) before the panel was seated,
(b) after voir dire and strikes, (c) after the State rested, (d) after the jury charge discussion but before
argument, and (e) during jury deliberation after receiving notes from the jury. (1) 

 Conference (a) occurred in the midst of the district court's opening remarks to the jury
panel. The court said:


 You will discover we have more than one case set from this morning to the afternoon
in the event something happens or anyone--something has happened on all of them
that has delayed us. I can't tell you what it is. Beyond my control. I can tell you
that.


 I was trying to wait to find out because I knew that I was probably going to give you
a break while we try to get underway, before we get underway. I also anticipate that
there is something that I am going to have to do outside your presence. I can't do it
even now.


 (Off-the-record discussion.)


 Members of the jury panel, I am probably going to give you a recess of ten minutes
in about one or two minutes.


The judge then instructed the jury not to discuss the case while in recess and to return to their same
seats in ten minutes. Hill asserts that this conference relates to his motions in limine. Even if so,
motions in limine do not preserve error even if the movant objects to the violation of a granted
motion. Brazzell v. State, 481 S.W.2d 130, 131 (Tex. Crim. App.1972); Harnett v. State, 38 S.W.3d
650, 655 (Tex. App.--Austin 2000, pet. ref'd). We conclude that Hill has shown no harm from any
constitutional or substantive error with regard to conference (a).

 Conference (b) occurred in two parts after the parties presented their strikes. The
court explained to the venire that the clerk was compiling the strike lists to determine the jurors. The
court instructed the venire what those selected should do when their names were called, then said,
"Those of you who are not selected, we can try to find a trial for you in the morning if you like." The 
first off-the-record discussion then occurred, followed by the calling of the names of the selected
jurors. The court then thanked the members of the jury panel who were not selected and said:


 Before I excuse you, the clerk and the bailiff have some information for you. The
clerk is required to get you to fill out a form that is self-explanatory once you look
at it. Also [we'll] pass out some information with regard--[defense attorney] Mr.
Rink, come up.


 (Conference at the bench)


 If you need anything for your employers, they will pass that out to you. Again, on
behalf of the judges of the community, thank you very much. You can leave once
you complete that duty.


The balance of the jury panel was then excused. Hill does not speculate what these conferences
entailed. The calling up of defense counsel before the second one is the only hint that they might
have had anything to do with the defendant. We find no showing of harm from constitutional or
substantive error.

 Conference (c) occurred immediately after the State rested. The court then addressed
defense counsel. 


 THE COURT: Mr. Rink.


 MR. RINK: Your Honor, could we have a short recess?


 THE COURT: Come up and talk to me first.


 (Off-the-record discussion.)


 THE COURT: Members of the jury, I need you to retire to the jury room for a few
minutes. Ought to be less than five, about five. Don't talk to each
other about the case and I will give you further instructions after
that. Can't leave the jury room.


After the jury left the courtroom, the court inquired whether anything needed to occur outside the
presence of the jury. Hill moved for a directed verdict, the court denied the motion, and Hill
announced he would rest. The court then recalled the jury to allow Hill to rest and the State to close
in front of the jury. We find no showing of harm from constitutional or substantive error.

 Conference (d) occurred after the jury charge discussion but before arguments. After
the parties announced they had no objections to the charge, the court inquired, "How much time do
you-all want to talk?" An off-the-record discussion ensued, followed by the court's recorded
directive to bring in the jury. We find no showing of harm from constitutional or substantive error.

 The court reporter did not expressly note conference (e) in the record. Hill posits that
this conference happened pursuant to the mandates of Texas Code of Criminal Procedure article
36.27, which provides as follows:


 When the jury wishes to communicate with the court, it shall so notify the sheriff,
who shall inform the court thereof. Any communication relative to the cause must
be written, prepared by the foreman and shall be submitted to the court through the
bailiff. The court shall answer any such communication in writing, and before giving
such answer to the jury shall use reasonable diligence to secure the presence of the
defendant and his counsel, and shall first submit the question and also submit his
answer to the same to the defendant or his counsel or [sic] objections and exceptions,
in the same manner as any other written instructions are submitted to such counsel,
before the court gives such answer to the jury, but if he is unable to secure the
presence of the defendant and his counsel, then he shall proceed to answer the same
as he deems proper. The written instruction or answer to the communication shall
be read in open court unless expressly waived by the defendant.


 All such proceedings in felony cases shall be a part of the record and recorded by
the court reporter.


Tex. Code Crim. Proc. Ann. art. 36.27 (West 1981) (emphases added).

 The record indicates that the jury sent inquiries to the court during deliberations and
that some conference preceded the court's responses to the jury's questions because the court told
the jury, "The lawyers have had an opportunity to see the questions. Members of the jury, we are
not certain what it is you are asking with either of your questions." The court directed the jury to
clarify its first two questions because, "[n]obody is certain what you are asking in either of these
two." Regarding a third question, in which a juror requested Hill to testify, the court directed the
jury to the section of the charge regarding the defendant's right to choose whether to testify and the
jury's responsibilities regarding that decision. After a recess the jury sent a new question asking, "In
the case of State exhibit 3, is it illegal to copy US currency without voiding it? If the action is not
legal, does that make exhibit 3 non-admissible. Or further, does it call the whole case into
question?" The court responded, "The answer that we are submitting to that is as follows: The jury
is not asked to consider whether State's Exhibit 3 is admissible because State's Exhibit 3 was
admitted just as other evidence and exhibits for the jury to consider in arriving at a verdict." 

 Though Hill did not object on the record to these statements by the court or to the
failure to record any conference regarding the questions, he now contends that the absence of any
record of the implied conference prevents him from showing that he was harmed by the lack of
recording or from having any objections he made overruled. 

 We conclude that Hill has failed to show any harm from a constitutional or
substantive error. He had the opportunity to state any objections in open court in front of the jury;
he stated none. The court's statements indicate that the court and all counsel were confused by the
original two questions. We find no error or harm in the court's reiteration of the charge regarding
Hill's right to choose whether to testify. In response to the jury's restated question regarding the
photocopied money, the court again used the plural pronoun to preface the court's answer, indicating
accord with the court's statement. Regardless, the absence of a record did not prevent Hill from
challenging the court's response to the restated question in points of error five and six, discussed
below; also, as discussed below, we find no harmful error in the court's response to the restated
question. Hill has shown no errors impinging on constitutional or substantial rights and has shown
no egregious harm from the failure to record any conferences regarding the jury's questions.

 We conclude that Hill has not shown harm from a constitutional or substantial error
occurring during any of the unrecorded proceedings. We overrule points three and four.

 By points of error five and six, Hill contends that the district court erred in its answers
to notes the jury sent to the court during deliberations. The jury originally asked, "In the course of
preparing a case, if an illegal action is committed by the State, even if minor, does that overthrow
the case?" After the court asked for clarification, the jury sent the note discussed above specifically
asking if copying the twenty-dollar bill rendered the copy (State's exhibit 3 [SX-3]) inadmissible and
imperiled the State's case; as set out above, the State responded that the jury was not to question the
admissibility of SX-3. Hill contends that the court's response was erroneous because the jurors were
entitled to disregard illegally obtained evidence. See Tex. Code Crim. Proc. Ann. art. 38.23(a) (West
Supp. 2001). Hill contends that SX-3 was obtained in violation of a federal statute providing that
"[w]hoever prints, photographs, or in any other manner makes or executes any engraving,
photograph, print, or impression in the likeness of any such obligation or other security, or any part
thereof . . . except by direction of some proper officer of the United States--Is guilty of a class B
felony." See 18 U.S.C. § 474 (2000). He contends SX-3 is not within the exception for illustrations
that requires they be a different size than the illustrated obligation. See 18 U.S.C. § 504 (2000). 
Because Hill did not raise this objection at trial, he contends that this is fundamental error that
caused him egregious harm. See Brooks, 967 S.W.2d at 950.

 We conclude that the district court did not err. Evidence will not be excluded under
article 38.23 for statutory violations that are unrelated to the exclusionary rule's purpose to prevent
illegal collection of evidence. Roy v. State, 608 S.W.2d 645, 651-52 (Tex. Crim. App. 1980)
(violation of assumed name statute did not require suppression of evidence); Lane v. State, 951
S.W.2d 242, 243 (Tex. App.--Austin 1997, no pet.) (police officer's failure to give written warning
before administering breath-alcohol test did not invalidate test results because intent of statute
fulfilled by understood oral warning); Stockton v. State, 756 S.W.2d 873, 874 (Tex. App.--Austin
1988, no pet.) (undercover police officer's violation of education code by falsely enrolling in school
did not require suppression of evidence of illegal drug sales). Here, the allegedly violated statute is
intended to prevent counterfeiting of money. The State did not "obtain" any evidence through the
copying of the bill; the copy was not used in the drug purchase. The police officer merely used the
copy to check whether the actual bill he paid to the drug seller was the same bill recovered from the
defendant; essentially, the police officer used a speedy way of copying the serial number that
eliminated the possibility of misrecording that number. Because the alleged counterfeiting violation
did not lead to the gathering of evidence, the district court did not err by failing to exclude the copy.

 Even if the district court erred, we find no egregious harm. The answer Hill believes
should have been given would have allowed the jury to disregard the photocopy of the twenty-dollar
bill; it would not have required the jury to disregard the copy, allowed the jury to disregard all of the
testimony about the bill itself, or allowed the jury to "overthrow" the entire case. The photocopy,
which Hernandez made before the transaction, was introduced to show that the twenty-dollar bill
found near Hill after the transaction was the same twenty-dollar bill Hernandez gave to the seller,
and thus that Hill was the seller. Even if the jury disregarded the photocopy, they could not have
ignored other testimony connecting the particular twenty-dollar bill and Hill. Hernandez's
identification of the twenty-dollar bill was not entirely dependent on the photocopy; besides
identifying the photocopy, Hernandez testified that his report contained the serial number of the bill
he gave to Hill. In addition to identifying the money, Hernandez identified Hill as the man who sold
him the crack cocaine just five minutes after the transaction. At trial, Hernandez again identified
Hill as the man who sold him the crack cocaine. Orten identified the twenty-dollar bill and
connected it to Hernandez as "[Hernandez's] money" from the transaction. Orten also identified Hill
at trial. We conclude that the photocopy of the twenty-dollar bill did not contribute materially to the
identification of Hill and the consequent conviction, and thus did not cause egregious harm. We
overrule points five and six.

 By points of error seven, eight, and nine, Hill complains of the admission of SX-4 and
SX-5, which contained copies of judgments of conviction based on pleas of nolo contendere to
respective charges of theft and driving with a suspended license. (2) He contends the court
fundamentally erred by admitting these exhibits and by considering them. He contends that the
exhibits were fatally flawed because the judgments lacked language showing that he was adjudged
guilty. See Tex. Code Crim. Proc. Ann. art. 42.01, § 1 (West Supp. 2001); Richie v. State, 542
S.W.2d 422, 424 (Tex. Crim. App. 1976) ("Although the 'judgment' in the instant case recites
appellant's plea of guilty and the trial court's acceptance of the same, it nowhere states that appellant
was adjudged to be guilty . . . ."). The Code requires that judgments "reflect . . . [i]n the event of a
conviction that the defendant is adjudged guilty of the offense as found by the verdict of the jury or
the finding of the court . . . ." Tex. Code Crim. Proc. Ann. art. 42.01, § 1(8). Both challenged
judgments state, "The Court admonished the Defendant as required, heard the Defendant's plea and
evidence admitted thereon, and found the Defendant GUILTY [of the charged offense]." This is not
the mere acceptance of the plea criticized in Richie, 542 S.W.2d at 424, but an affirmative finding
that Hill was guilty. The absence of the word "adjudged" does not deprive the judgment of any
power. We conclude that the district court committed no error in admitting and considering SX-4
and SX-5. We overrule points seven, eight, and nine.


CONCLUSION


 Having overruled Hill's points of error, we affirm the judgment.



 

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed 

Filed: December 20, 2001

Do Not Publish
1.   Hill lists seven conferences, but concedes that context indicates that one relates to another case
and another is his discussion with his counsel regarding whether he (Hill) would testify.
2.   Hill does not challenge evidence relating to the two felony convictions used to enhance his
punishment.