IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1723-05






MARTINA VANSICE STUHLER, Appellant



v.



THE STATE OF TEXAS


 




ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


DENTON COUNTY





 Price, J., delivered the opinion of the Court, in which Meyers, Johnson,
Holcomb and Cochran, JJ., joined. Keller, P.J., filed a dissenting opinion in which
Womack, Keasler, and Hervey, JJ., joined.



O P I N I O N



 The appellant was convicted by a jury of the first degree felony offense of injury to
a child and sentenced to sixty-five years' confinement in the penitentiary and a fine of
$10,000. The jury was instructed in the same application paragraph that it could convict the
appellant should it find, alternatively, either that she caused the victim serious bodily injury,
or that she caused him serious mental deficiency, impairment, or injury. (1) On appeal, the Fort
Worth Court of Appeals reversed the conviction, holding in an unpublished opinion that the
evidence was insufficient to support the conviction on the basis of serious bodily injury, and
remanding the cause for a new trial on the alternative theory that the appellant caused serious
mental deficiency, impairment, or injury because the jury charge, which had authorized
conviction alternatively under either theory, erroneously authorized a non-unanimous jury
verdict. (2) We granted the State's petition for discretionary review to examine the court of
appeals' conclusions both that the evidence was legally insufficient to prove serious bodily
injury and that the jury charge authorized a non-unanimous verdict.

THE FACTS


 The indictment alleged, in relevant part, that on or about March 31, 2003, the
appellant "intentionally or knowingly cause[d] serious bodily injury or serious mental
deficiency, impairment, or injury to [M.V.], a child 14 years of age or younger, by act, to-wit:
by confining or restraining [M.V.] in a bathroom or bedroom." During the jury-charge
conference, the appellant's counsel persuaded the trial court to remove the theory of
confinement or restraint in the bedroom from the charge. Accordingly, the application
paragraph authorizing the jury to convict the appellant of the first degree felony offense of
injury to a child read:

 Now, if you find from the evidence beyond a reasonable doubt that on
or about the 31st day of March, 2003, in Denton County, Texas the defendant 
. . . did then and there intentionally or knowingly cause serious bodily injury
or serious mental deficiency, impairment, or injury to [M.V.], a child 14 years
of age or younger, by act, to-wit: by confining or restraining [M.V.] in a
bathroom, you will find the defendant guilty of Injury to a Child, as charged
in the indictment.


Thus, the State's theory of the case was that the appellant caused M.V. either serious bodily
injury or serious mental deficiency, impairment, or injury by confining or restraining him on
a particular occasion in a bathroom.

 The evidence at trial relevant to this allegation showed that the appellant was M.V.'s
step-mother. When M.V. was three years old, in December of 2002, he was placed in his
biological father's custody. His father lived with the appellant and their three young children
in a single-wide trailer. The appellant delivered newspapers in the early morning hours, and
would then sleep during the day. On one or more occasions, she locked M.V. in the
bathroom of the trailer while she slept. The appellant's oldest child testified that the
appellant restrained M.V. by duct-taping him to the toilet seat. The trauma of this
confinement and/or restraint caused M.V. to suffer from constipation. By the time Child
Protective Services removed M.V. from the trailer and placed him in foster care, in April of
2003, the constipation had become moderate to severe, and his abdomen was distended and
hard.

 The State presented evidence to show that M.V. suffered both physical and
psychological damage from this abuse. With respect to serious bodily injury, the State
offered the testimony of a pediatrician, Dr. Cindy Holt, who had treated M.V. in the hospital
shortly after he was placed in foster care. She first testified as follows:

 Q. At some point, did you send the child for some x-rays and tests?


 A. The emergency room did that and those were available for my
review on his admission.


 Q. And did you review those as part of your examination of this child?


 A. Yes.


 Q. And tell the jury what, if anything, the x-rays revealed.


 A. The x-rays revealed increased stool throughout the colon, indicating
that the child was constipated. The symptoms that he presented with would
have certainly supported that diagnosis, along with some minor obstruction of
his urinary tract from the constipation given that he couldn't urinate.


 Q. Was this a mild case of a child being constipated or severe?


 A. Moderate to severe.


 Q. What kind of concerns do you get when something like this
happens?


 A. Constipation in and of itself is fairly common during toilet-training,
as children - they don't want to defecate on the toilet - tend to hold it, and it
becomes hard and they try to defecate and it hurts, and then they really don't
want to go and it becomes this vicious cycle. So in a child his age, in and of
itself the constipation is not concerning in the absence of other findings. It's
just a matter of intervention with appropriate toilet-training and evacuating the
colon so that the act of defecation is no longer painful and then retraining them
to basically go without pain.


* * *



 Q. I have previously shown you the legal definition of "serious bodily
injury." Is that right?


 A. Yes.


 Q. And if "serious bodily injury" means bodily injury that creates a
substantial risk of death or that causes death, I guess you could comment on
that part? In your medical opinion and based on your training and experience,
after examination of this child, in your opinion did he have bodily injury that
created a substantial risk of death?


 A. Yes, he did.


 Q. And tell the jury why you say that.


 A. When I saw [M.V.], he was not at risk of death. The injuries that
he happened to sustain were not an immediate risk of death. However, that
probably was luck of the draw. When you sustain a large trauma to the
abdomen, you risk not only injuring the liver, you risk injuring a much more
fragile organ called the spleen, and that's located on the other side of the
abdomen from the liver. If you injure the cells of the spleen, you can bleed to
death very quickly. And he didn't sustain an injury to his spleen that we could
detect. However, again, he was lucky. That much abdominal trauma carries
a substantial risk of serious injury to that organ and if that organ had have been
injured, he could have died.


 Q. So with the liver enzymes as well elevated, as high as they were, is
that something that causes a concern as far as creating any kind of substantial
risk of death of this child if untreated?


 A. You mean the liver enzymes alone?


 Q. The liver enzymes and the - I guess the total assessment of this
child taken together.


 A. Yes, especially if the injuries were to continue to happen. Acutely,
I would have to say no, he did not, but . . .


* * *



 A. "Acute" means within the last one to two weeks at the outside. 
Potentially some injuries also within the last few days. * * * The severity of
his constipation, if it had been long-standing, had progressed. In other words,
when I saw him, he couldn't urinate. He couldn't go to the potty at all. That
would not have been there for the last three months, five months, or a year
because obviously he would have come to medical attention at that point. So
when I put the whole picture together of recent trauma to the abdomen, again,
the liver enzymes, trauma to the abdomen didn't happen any longer than a
week or two before I saw him. (3)


On cross-examination, the appellant's counsel also questioned Dr. Holt about serious bodily
injury:

 Q. So "acutely" in medical terms means like now, presently. That's
one of the -


 A. Yes.


 Q. So when you talked about the abdomen and the risk of death, you
said acutely, no. But it could have if the injury would have been different, if
the spleen would have been hit, or if it would have gone on. Am I
characterizing that right?


 A. Yes.


 Q. So the injury that is acute - and by that I mean the injury that is
present, not "could be," "lucky miss," none of those qualifiers. The injury that
is acute, the injury that exists, does not create a risk of death?


 A. [M.V.] was not at risk of dying when I saw him.


 Q. Doctor, do the injuries that are present have a risk of death? 
Without adding his spleen could have been damaged or if, in your opinion,
abuse would have continued. Take those out of the equation. As you
examined him, does the injury create a substantial risk of death? It doesn't,
does it?


 A. The injury that he presented with, no.


During later cross-examination, Dr. Holt herself once again broached the subject of whether 

the constipation caused serious bodily injury:

 Q. Did we see any other evidence on either leg that was serious -
serious bodily injury in any way, shape, or form, the legs? Like are any of
those bruises on the legs serious bodily injury?


 A. No. The constipation could have been if there was no intervention. 
I don't know if that matters.


 Q. Well, eventually. But as it presented itself that day, I think we
talked about it was moderate to severe and it was not a risk of death as it
presented itself. Would that be fair?


 A. Because there was intervention.


 Q. My question is: As it presented itself, it did not have substantial risk
of death?


 A. Because there was intervention.


 [Defense Counsel]: Objection, nonresponsive.


 THE COURT: I don't know if it is nor not. I mean, if you can
answer the question yes or no, answer the question yes or no. If you can't,
then you have your answer.


 Q. (BY [Defense Counsel]) As it presented itself, did the child at that
moment - did that injury create substantial risk of death? Not what could
happen if it went on for a long time, but right then and there?


 A. When you present with cancer, you're not at risk of death, but if you
don't treat it, you're going to die.


 [Defense Counsel]: Objection, nonresponsive.


 THE COURT: That's nonresponsive. Sustained.


 Q. (BY [Defense Counsel]): Doctor, can you please try to answer my
question?


 A. Yes. I'm not trying to be difficult, but I'm also trying to present the
truth and be accurate.


 Q. Did the injury as it presented itself at that time -


 A. When [M.V.] came to me, he was not on the verge of death, if that's
what you're asking me.


 Q. That's not what I asked you. I asked you: Did the injury as it was
acutely presented create a substantial risk of death?


* * *



 THE WITNESS: The way I understand the question you're asking me,
when I saw [M.V.], was he at risk of dying at that moment? And the answer
is no, he was not. That's the way I understand the question.


 Q. (BY [Defense counsel]): In the time frame for it to progress to
where it would be risk of death, how much longer of a time frame are you
talking about?


 A. With the injuries that he had, again, if you assume that they were not
repeated, it would have to be a significant length of time.


 Q. Okay. All right, then.


 A. Weeks.


 Q. Well, I'm really just talking about the abdomen at this point.


 A. Yes. I agree. I'm thinking the same thing.


 Q. At least - well, weeks, you said?


 A. Days to weeks, yes.


 Q. You're changing it now to days or weeks? There's a big difference
between the two. You said weeks. Is it weeks?


 A. Days to weeks.


 Q. Okay. And so you're saying he could have died in two days?


 A. If the constipation had progressed and he had ruptured anything in
his intestines, yes.


 Q. If anything of those things would have happened. Did you see any
evidence that that was on the verge of happening?


 A. On the verge of happening, meaning within the next 24 hours? No.


 Q. Okay. Any evidence that it was going to happen in 48 hours?


 A. I don't know that. He was obstructed with his urinary tract and I
don't know. I can't say what would have happened.


 Q. Okay. Once the bowels were evacuated, is there any evidence or
would you - well, do we have any evidence that there was serious permanent
disfigurement due to that. Did his stomach go back down?


 A. You're speaking of the abdomen -


 Q. Yes, ma'am.


 A. And the intestines? No, there was no serious long-term
ramifications that appeared to be evident.


The State declined to take Dr. Holt on re-direct examination.

 To establish serious mental deficiency, impairment, or injury, the State offered the
testimony of a therapist, Dr. Michelle Young. M.V. told Dr. Young during his treatment that
the appellant had taped him to the toilet seat. The trauma of this experience caused M.V. to
suffer from Post-Traumatic Stress Disorder. (4) The appellant does not now challenge that Dr.
Young's testimony was sufficient to establish serious mental deficiency, impairment, or
injury, and for purposes of this opinion we will assume that it was. (5)

ON APPEAL


 The court of appeals held that the trial court erred in failing to grant an instructed
verdict on the part of the indictment that alleged serious bodily injury because the evidence
was legally insufficient to establish that theory of the offense of injury to a child. As the
court of appeals explained:

 Dr. Holt testified that, if the constipation had been left untreated and
had progressed, it could have become serious bodily injury. But she
acknowledged that there was no evidence of permanent disfigurement to M.V.
as a result of his constipation and that there were "no serious long-term
ramifications" to his stomach and intestines. She said that M.V. began to stool
spontaneously after being given an enema.


 Although this evidence shows that M.V.'s constipation could have
become a serious bodily injury absent medical intervention, it does not show
that the injury, "as it was inflicted," constituted serious bodily injury as that
term is statutorily defined. (6)


Accordingly, the court of appeals "render[ed] a judgment of acquittal on the serious bodily
injury offense[.]" (7)

 The court of appeals did not order an outright acquittal, however, because the
evidence did support a conviction for injury to a child on the theory that the appellant had
caused M.V. to suffer serious mental deficiency, impairment, or injury. The two theories
were submitted to the jury in the disjunctive in a single application paragraph. The appellant
argued on appeal that the error in submitting the theory of serious bodily injury was harmful
because "there is strong reason to believe that the jury did not unanimously agree on a proper
legal standard when they convicted" her. (8) Therefore, the court of appeals proceeded to
inquire whether the trial court erred to instruct the jury that it could convict the appellant of
injury to a child without indicating unanimity on whether the appellant's conduct caused
serious bodily injury on the one hand, or serious mental deficiency, impairment, or injury"
on the other. In its analysis of this question, the court of appeals seems to have assumed that
the appellant objected to the jury charge, because it announced that it was looking for "some
harm," rather than "egregious harm," as would be the case for unobjected-to jury-charge
error. (9)

 The court of appeals concluded that, under the plain language of the statute, (10) causing
serious bodily injury should be regarded as an offense separate from causing serious mental
injury and held that a jury charge that failed to require unanimity as between these two
offenses violated the appellant's right to a unanimous jury verdict. (11) "This harm is
exacerbated by the fact that there is no evidence to support one of these offenses." (12) The
court of appeals therefore reversed the conviction and "remand[ed] the cause to the trial court
for a new trial on the serious mental injury offense." (13) 

SERIOUS BODILY INJURY


 The Penal Code defines serious bodily injury to be "bodily injury that creates a
substantial risk of death or that causes death, serious permanent disfigurement, or protracted
loss or impairment of the function of any bodily member or organ." (14) The jury charge
instructed the jury accordingly. This Court has long held that in assessing the sufficiency of
the evidence to establish serious bodily injury, the question is the degree of risk of death that
the injury caused, or the disfiguring or impairing quality of the injury, "as it was inflicted,
not after the effects had been ameliorated or exacerbated by other actions such as medical
treatment." (15) The State now takes issue with the court of appeals' conclusion that M.V.'s
constipation did not constitute serious bodily injury "as it was inflicted." Because the
constipation did not actually kill M.V., we will address in turn whether the evidence shows
that the constipation, "as it was inflicted," 1) created a substantial risk of death; 2) caused
serious permanent disfigurement; or 3) caused protracted loss or impairment of the function
of any bodily member or organ.

A. Substantial Risk of Death


 The State asserts that the court of appeals erroneously assessed the risk of death from
M.V.'s constipation after medical intervention, rather than assessing what the risk would
have been had the constipation continued "unattended." We disagree. Dr. Holt plainly
testified that as M.V. "presented" to her, he was not at risk of death. She further testified
that, taking continued abuse out of the equation, she did not regard M.V.'s condition as life-threatening.

 This does not necessarily mean, of course, that his constipation could not have become
deadly, as Dr. Holt testified, had it been allowed to "progress." Although M.V. stooled
spontaneously when given an enema in the hospital, the constipation could conceivably have
progressed to a life-threatening stage absent that medical intervention. But it is unclear from
Dr. Holt's testimony that she believed the constipation would have progressed absent medical
intervention. The injury that the appellant inflicted upon M.V. occurred at no discrete
moment in time, as would be the case with a blow, a knife wound, or a gun-shot. Rather, it
was the result of the appellant's having confined M.V. in the bathroom, and perhaps having
restrained him physically on the toilet. The injury did not happen in an instant, but over an
undetermined period of time, apparently as a psychological reaction to the confinement
and/or restraint. (16) The evidence does not speak to whether, once the confinement and
restraint came to an end and the psychological trauma dissipated, the constipation would have
"progressed" to a deadly level, even absent medical intervention. Dr. Holt's testimony, to
the extent that it addressed this question at all, seems to have indicated that, removing
continued abuse from the equation, she did not consider M.V.'s condition to be dangerous. 
We take this to be the court of appeals' meaning when it declared that the injury "as it was
inflicted" was not shown to be life-threatening. In making the determination whether an
injury caused a substantial risk of death, courts should look to the degree of injury that the
assaultive behavior in fact caused, not the degree of injury that might have resulted had the
assaultive behavior persisted. Because the State had the burden of production and persuasion
on the issue of serious bodily injury, the court of appeals correctly held that this deficiency
in the evidence precludes a rational jury finding that the constipation created a substantial
risk of death.

B. Serious Permanent Disfigurement


 When expressly asked about serious permanent disfigurement to M.V.'s stomach or
intestines, Dr. Holt replied that "there was no serious long-term ramifications that appeared
to be evident." There is no contrary evidence in the record. The court of appeals correctly 
concluded that there was also insufficient evidence to show serious bodily injury by this
statutory definition. 




C. Protracted Loss or Impairment of the Function


of Any Bodily Member or Organ



 Dr. Holt was never asked to express any opinion whether the constipation resulted in
the protracted loss or impairment of function of M.V.'s stomach or intestines. As we have
noted, however, she did opine that she foresaw no "serious long-term ramifications" to these
organs from the level of constipation that M.V. had suffered by the time he was brought to
the hospital. Constipation is, of course, by definition a dysfunction of the bowels. It is
possible, perhaps even probable, that, had M.V.'s constipation progressed, it would have
caused some "protracted" loss or impairment of function. But as we have observed, Dr. Holt
did not testify that, once the confinement and restraint came to an end, the constipation would
inevitably have progressed to this level. The evidence does not show one way or the other
whether M.V. could have eventually stooled spontaneously at some point, even without
medical intervention, once the psychological trauma of his confinement and restraint were
allowed to subside. Again, this lack of clarification in the evidence must cut against the party
with the burden of proof.

 It is true, as the State emphasizes, that the constipation had reached a point that it
was obstructing M.V.'s urinary tract. But Dr. Holt expressly described this dysfunction as
"minor." Once again, while it is conceivable that the urinary obstruction, if left untreated,
might have progressed or endured to the point that it would support a jury finding of a
protracted loss or impairment of urinary function, there was no testimony to this effect, and
the conclusion that it would have so progressed is not self-evident.

 We do not think that the court of appeals misapplied our earlier case law. We agree
with its conclusion that the evidence did not support a jury finding of serious bodily injury
beyond a reasonable doubt.

JURY UNANIMITY


 For the first time in its brief on the merits, filed after we granted the petition for
discretionary review, the State asserts that the court of appeals erred to evaluate the
disjunctive application paragraph for some harm instead of egregious harm. Our review of
the record reveals that the appellant failed to specifically object that the application paragraph
that was ultimately submitted authorized the jury to convict her upon a finding either that she
caused M.V. serious bodily injury or serious mental deficiency, impairment, or injury, thus
allowing a guilty verdict without requiring all twelve jurors to agree upon the type of injury
that was inflicted.

 Of course, the objection that the appellant did make to the application paragraph, had
it been sustained, would have mooted any objection on the basis of jury unanimity. The trial
court would then have removed the serious bodily injury element from the application
paragraph, thus requiring all of the jurors to find serious mental injury as a prerequisite to
conviction. Still it is accurate to say, as the State belatedly contends, that the appellant failed
to make a specific jury-unanimity objection at the trial court level. We need not decide
whether the State's argument with respect to the proper harm analysis comes too late. We
agree with the court of appeals that the application paragraph did violate the appellant's right
to a unanimous jury verdict and hold that this defect would require reversal of the conviction
even under an egregious-harm standard of review.

A. Error in the Application Paragraph


 Article V, Section 13 of the Texas Constitution requires a unanimous jury verdict in
all felony cases. (17) The court of appeals held that jury unanimity was required with respect
to the type of injury caused in this case on authority of this Court's opinions in Francis v.
State (18) and Ngo v. State. (19) But neither of these two cases is dispositive of the issue presented
here.

 Both Francis and Ngo involved separate and discrete incidents of commission of a
single statutorily defined offense, but by different acts. In Francis, in a prosecution for
indecency with a child, the jury was not required to agree as between two different theories
of indecency (touching the breast versus touching the genitals) that occurred on different
dates. In Ngo, a prosecution for credit card abuse, the jury was not required to agree among
three theories of the offense (stealing a credit card versus receiving a stolen credit card versus
presenting a credit card with intent to obtain a benefit fraudulently) that the evidence showed
occurred on three separate and discrete occasions. The rationale of these two cases seems
to turn not so much on the fact that different theories of the offense were involved, but on
the fact that each of the separate and distinct theories of commission of the offense occurred
at a separate and discrete point in time from the others. We held that jury unanimity required
that the jury agree upon a single and discrete incident that would constitute commission of
the offense alleged. (20)

 In the instant case, it is not clear whether the State was relying upon a single act of
confining and/or restraining M.V., or upon a series of such confining and/or restraining
incidents. (21) The evidence suggested more than one such incident, but did not pinpoint any
particular one. Under these circumstances, if it was the series of incidents that ultimately
served to cause the constipation and consequent injuries to M.V., rather than a discrete
incident, the State would not be required to elect among them, and the jury need not
necessarily have agreed upon a particular incident of confinement and/or restraint to justify
a conviction. (22) In Crocker v. State, (23) the appellant caused injury to his victim by exposing
him to a radioactive substance on a number of occasions over a period of time. (24) Rejecting
the appellant's argument that the State should have been required to elect among the various
discrete incidents of exposure, we held:

 If it has ever been the rule in this state that when one sets out to maim
or murder another gradually through a series of acts the prosecution is required
to elect and rely upon only one of the acts to obtain a conviction, it is no longer
the rule. We hold that the court did not err in refusing to require the State to
elect among the transactions involving radiation exposure. (25)


On facts such as these, the series of acts constitutes the commission of the offense. It follows
that the jury charge should not require the jury to agree as to any particular act in the series
before it can convict. Inasmuch as they hold that jury unanimity requires jury agreement as
to a separate and discrete incident to convict, Francis and Ngo are inapposite here. (26)

 Nevertheless, we agree with the court of appeals' conclusion that the jury should have
been required to agree unanimously that the appellant caused either serious bodily injury or
serious mental deficiency, impairment, or injury. Since the court of appeals issued its
opinion in this cause, we have decided Jefferson v. State. (27) Like the instant case, Jefferson
involved a prosecution for injury to a child. We were called upon to decide whether the jury
charge should have required the jury to make a unanimous finding whether the appellant
caused the injury by his action or by his omission, either of which is an acceptable theory
under Section 22.04 of the Penal Code. We held that the jury need not agree unanimously
that Jefferson caused injury by act or by omission. (28)

 Our reasoning in arriving at this conclusion is instructive. Whether the jury must
unanimously find that injury to a child was accomplished by act or omission was, we held,
primarily a question of legislative intent. (29) We observed that prior case law has regarded the
gravamen of the offense of injury to a child to be, not the particular conduct that caused the
injury, but the resulting injury that the conduct caused. In other words, injury to a child is
a "result of conduct" offense, which does not specify the "nature of conduct" by which the
result is caused. (30) Whether Jefferson caused the injury alleged in that case by an act or an
omission was not elemental, we concluded, since the statute does not make the "nature of
conduct" of any consequence. Thus the Legislature could not have intended for the state law
requirement of jury unanimity to apply, and the jury verdict need not reflect a unanimous
determination whether the offense was committed by act or omission.

 In a concurring opinion that joined the majority, Judge Cochran suggested a general
rule of thumb for making this determination of legislative intent:

 In sum, we must return to eighth-grade grammar to determine what
elements the jury must unanimously find beyond a reasonable doubt. At a
minimum, these are: the subject (the defendant); the main verb; and the direct
object if the main verb requires a direct object (i.e., the offense is a result-oriented crime) . . . . Generally, adverbial phrases, introduced by the
preposition "by," describe the manner and means of committing the offense. 
They are not the gravamen of the offense, nor elements on which the jury must
be unanimous. (31)


Applying this rule of thumb in the instant case, we conclude that the jury charge should have
required a unanimous verdict whether the appellant caused serious mental deficiency,
impairment, or injury.

 In Section 22.04(a) of the Penal Code, the main verb defining the offense of injury to
a child is, of course, "causes." The direct object of that main verb is, variously, "serious
bodily injury," "serious mental deficiency, impairment, or injury," or plain "bodily injury." (32) 
The Legislature has thus defined the offense of injury to a child according to the kind and
degree of injury that results. As the court of appeals noted, (33) these various results are set out
in different subsections of the statute, and the degree of the offense is determined, at least in
part, according to which of the results the defendant's act or omission caused. (34) We think
that the court of appeals correctly concluded that the Legislature intended the separate results
spelled out in the various subsections of the statute to be elemental and thus required jury
unanimity. (35)

B. Egregious Harm


 Jury-charge error is egregiously harmful if it affects the very basis of the case,
deprives the defendant of a valuable right, or vitally affects a defensive theory. (36) In
examining the record to determine whether jury-charge error is egregious, the reviewing
court should consider the entirety of the jury charge itself, the evidence, including the
contested issues and weight of the probative evidence, the arguments of counsel, and any
other relevant information revealed by the record of the trial as a whole. (37) We conclude that
the jury-charge error in this case deprived the appellant of her valuable right to a unanimous
jury verdict.

 Although the evidence was sufficient to establish serious mental injury, by far the
greater bulk of the State's evidence in this case was devoted to trying to establish serious
bodily injury. For example, Dr. Holt's testimony with respect to serious bodily injury runs
more than twice as long in the reporter's record as Dr. Young's testimony regarding serious
mental injury. Moreover, Dr. Holt's testimony was not limited to bodily injury that resulted
from M.V.'s constipation. Much of her testimony related to other injuries M.V. sustained
in the appellant's care, including burns on his hand, a blackened tooth, bruises on various
parts of his body, and healing fractures of the leg and arm. (38) Given this emphasis in the
State's presentation of the case, the risk of a non-unanimous verdict was substantial.

 Unlike Ngo, in which we also found egregious harm from the failure of the jury
charge to require jury unanimity, (39) here the State's final argument did not make a point of
stressing to the jury that it need not agree which of the elemental facts occurred. But the
State did argue to the jury that the evidence would support a verdict based on either serious
bodily injury or serious mental injury. Since the jury charge itself did not require the jury to
agree on one result or the other, the jury could readily have convicted the appellant without
even substantively debating which of the two types of injury she caused. In no other part of
the jury charge or the arguments of counsel was the jury ever informed that it must
unanimously agree on one result or the other, or both.

 The major point of contention between the parties during final argument was whether
the appellant harbored the requisite culpable mental state to justify convicting her of the first
degree felony, rather than one of the lesser degrees of injury to a child. The State urged the
jury to find that it had been the appellant's conscious objective to inflict M.V.'s serious
injuries, whether bodily or mental-or at least she could have been substantially certain her
conduct would have caused such injury. The intentional infliction of serious injury to a child
is a first degree felony, (40) but the jury charge authorized conviction for the lesser-included
offenses of reckless serious (either bodily and mental) injury to a child, a second-degree
felony, (41) and criminally negligent serious (either bodily and mental) injury to a child, a state-jail felony. (42) Appellant's trial counsel urged the jury to reject the inference that the appellant
confined and/or restrained M.V. in the bathroom with a conscious objective or substantial
certainty that doing so would cause either serious bodily injury or serious mental injury. (43) 
In refuting this defensive argument, the State relied at least as heavily upon the bodily injury
that resulted (including the various injuries the jury was not ultimately authorized to convict
the appellant for) as the mental injury. We think that this focus of the jury argument could
only have increased the already substantial risk that the jury would not find it necessary to
agree as to which type of injury the appellant inflicted. In our view, the failure to instruct the
jury that it must unanimously determine that the appellant caused at least one of the two types
of injury deprived her of a fair and impartial trial. (44)


CONCLUSION


 The judgment of the court of appeals is affirmed.

Delivered: January 24, 2007

Publish
1. Tex. Pen. Code § 22.04(a)(1) and (2)("A person commits an offense if he intentionally,
knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly
by omission, causes to a child, elderly individual, or disabled individual . . . serious bodily injury [or]
serious mental deficiency, impairment, or injury[.]").
2. Stuhler v. State, (Tex. App.--Fort Worth, No. 0-04-208-CR, delivered September 29, 2005).
3. Because of bruising on M.V.'s abdomen and the elevated liver enzymes, Dr. Holt was of the
view that M.V. had suffered some kind of blow to the abdomen, and it is apparent that the "trauma"
to the abdomen of which she speaks was at least partly attributable to such a blow, rather than strictly
attributable to the constipation caused by the confinement and/or restraint in the bathroom. It was
also, apparently, the abdominal blow that triggered Dr. Holt's concern about the risk of injury to
M.V.'s spleen, but as her testimony demonstrates, she found no evidence of such a spleen injury. 
There is no evidence to show how M.V. might have sustained such a blow to the abdomen, and that
is not the injury upon which the State elected to proceed in the jury charge.
4. Other testimony showed that, whereas M.V. had been a happy child who had been toilet
trained prior to going to live with the appellant, afterwards he reverted to wearing diapers, hoarded
food, and was afraid to take baths. It was not shown that any of this behavior was caused specifically
by the experience of having been confined in the bathroom or restrained on the toilet.
5. As the court of appeals noted, the appellant practically conceded the sufficiency of the
evidence to prove mental injury on appeal. See Stuhler v. State, supra (slip op. at 10 n.17).
6. Stuhler v. State, supra (slip op. at 6) (footnotes omitted). For the proposition that the
seriousness of the injury must be assessed "as it was inflicted," rather than as "ameliorated or
exacerbated by other actions such as medical treatment[,]" the court of appeals cited Fancher v.
State, 659 S.W.2d 836, 838 (Tex. Crim. App. 1983), and Brown v. State, 605 S.W.2d 572, 575 (Tex.
Crim. App. 1980).
7. Id. (slip op. at 11-12).
8. Brief for the Appellant, at 5.
9. Almanza v. State, 686 S.W.2d 157, 171-2 (Tex. Crim. App. 1985) (opinion on State's motion
for rehearing) (construing Tex. Code Crim. Proc. art. 36.19); Abdnor v. State, 871 S.W.2d 726,
731-2 (Tex. Crim. App. 1994); Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986).
10. See note 1, ante.
11. Stuhler v. State, supra (slip op. at 10-11).
12. Id. (slip op. at 11).
13. Id. (slip op. at 12).
14. Tex. Pen. Code §1.07(46).
15. Fancher v. State, supra, quoting Brown v. State, supra. See also Boney v. State, 572 S.W.2d
529, 532 (Tex. Crim. App. 1978).

 
16. Indeed, although the indictment and jury charge required a finding of confinement and
restraint in the bathroom"on or about the 31
st day of March, 2003," the evidence suggested that this
event occurred on an unspecified number of occasions around that date, but in any event more than
once. However, by at least April 6, 2003, M.V. was no longer in the appellant's custody, so there
could have been no further occasions of confinement and/or restraint after that date. A foster mother
took M.V. to the hospital on April 9, 2003, and Dr. Holt examined him there on April 10, 2003.
17. Tex. Const. art. V, § 13.
18. 36 S.W.3d 121 (Tex. Crim. App. 2000).
19. 175 S.W.3d 738 (Tex. Crim. App. 2005).
20. See George E. Dix & Robert O. Dawson, 42 Texas Practice: Criminal Practice and
Procedure § 30.52, at 670 (2d ed. 2001) ("Francis involved different offenses rather than different
theories of one offense, apparently because 'different incidents' were presented in Francis.").
21. See note 16, ante.
22. See Dix & Dawson, supra, §30.57 (State not required to elect when "the evidence can be
analyzed as showing different and distinguishable incidents, but the proof of these incidents would
not permit a jury to find that the individual incidents each constituted the charged offense.").
23. 573 S.W.2d 190 (Tex. Crim. App. 1978).
24. Id. at 194-7.
25. Id. at 199.
26. See Jefferson v. State, 189 S.W.3d 305, 313 n.11 (Tex. Crim. App. 2006) (noting in dicta
that child-abuse crimes may be regarded as continuous offenses, which do "not require jury
unanimity on any specific, discrete act . . . .").
27. Id.
28. Id. at 306.
29. Id. at 312 (noting that, like the United States Supreme Court, we decide what level of
specificity is required in a jury verdict to satisfy the requirement of jury unanimity as a function, at
least in the first instance, of statutory construction, citing Richardson v. United States, 526 U.S. 813,
817-8 (1999)).
30. Ibid. For this proposition, we cited Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App.
1985), and Beggs v. State, 597 S.W.2d 375, 377 (Tex. Crim. App. 1980).
31. Id. at 315-6 (Cochran, J., concurring, joined by Price and Johnson, J.J.)
32. Tex. Pen. Code § 22.04(a)(1), (2) and (3), respectively.
33. Stuhler v. State, supra (slip op. at 10).
34. Tex. Pen. Code § 22.04(e), (f), and (g).
35. Because we hold that the Legislature contemplated jury unanimity with respect to the
particular statutory results the defendant caused, we need not proceed to the second step of the
analysis, which asks whether dispensing with the jury-unanimity requirement would violate due
process. See Jefferson v. State, supra, at 312, 313.
36. Hutch v. State, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (plurality opinion). See also,
Almanza v. State, supra, at 172; Ngo v. State, supra, at 750.
37. Bailey v. State, 867 S.W.2d 42, 43 (Tex. Crim. App. 1993); Almanza v. State, supra, at171; 
Ngo v. State, supra, at 750 n. 48.
38. The indictment alleged that the appellant caused serious bodily and mental injury by holding
M.V.'s hand under hot water and twisting or pulling his arm and leg. Ultimately, none of these
theories of the case was submitted to the jury.
39. 175 S.W.3d at 750-2.
40. Tex. Pen. Code § 22.04(e).
41. Id.
42. Id. § 22.04(g).
43. Indeed, during the charge conference at the guilt phase of trial, the appellant's counsel had
argued that the jury should not even be authorized to find her guilty of the first-degree felony offense
because the evidence did not establish that the appellant had caused the serious bodily or mental
injury intentionally or knowingly.
44. As the court of appeals observed, the harm is exacerbated by the fact that there was no
evidence to support serious bodily injury. Stuhler v. State, supra (slip op. at 11). Given the
emphasis in the State's evidence and in its final argument, at least some of the jurors might have
convicted the appellant under the belief that she intentionally or knowingly caused an injury that the
evidence does not support.