# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00019-CR
## NO. 03-07-00020-CR

**Paul Douglas Archer, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
NOS. CR2006-106, CR2006-107, HONORABLE JACK H. ROBISON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

After a consolidated trial of two indictments that alleged sexual offenses against two child victims, a jury convicted Paul Douglas Archer of nine counts of indecency with a child by contact, *see* Tex. Penal Code Ann. § 21.11(a)(1) (West 2003), two counts of indecency with a child by exposure, *see id.* § 21.11(a)(2), and seven counts of aggravated sexual assault, *see id.* § 22.021(a)(1)(B), (a)(2)(B) (West Supp. 2006). Archer elected to have the jury assess punishment. The jury assessed the maximum term of incarceration for each offense—twenty years for each count of indecency by contact, ten years for each count of indecency by exposure, and life for each count of aggravated sexual assault. The trial court ruled that each sentence in cause number CR2006-106 will be served concurrently, as will each sentence in cause number CR2006-107, but ruled that the sentences in CR2006-107 will be served consecutively to those in CR2006-106. Archer appeals, arguing in five issues that the trial court erred by limiting his questioning during voir dire, ordering

that the sentences in CR2006-107 run consecutively to those in CR2006-106, admitting hearsay evidence from an investigating officer on two occasions, and admitting testimony concerning a study that did not meet the learned-treatise exception to the hearsay rule. We will affirm the trial court's judgment.

## BACKGROUND

On January 1, 2006, Deputy Mike Smith of the Comal County Sheriff's Office responded to a 911 call placed by Jennifer Anderson. Anderson told Smith that Archer had touched her eight-year-old daughter, M.A., in an improper manner. Anderson also related that several months earlier, M.A. told her that Archer had touched twelve-year-old C.A., Archer's niece and M.A.'s friend and neighbor, in an improper manner. Smith then interviewed M.A., who told him that Archer had touched her "private parts" at Archer's house "once before Halloween and once or twice after." M.A. also stated to Smith that Archer had touched his niece C.A. Smith called his office's criminal investigations department and child protective services.

Because of the allegations by Jennifer Anderson and M.A. concerning Archer's touching of C.A., Smith next traveled to C.A.'s house, which was a few houses down from the Andersons' house on the same street. When Smith arrived, he discussed the allegations concerning C.A. with C.A.'s parents, Randy and Gina Archer. Randy and Paul Archer are brothers. Smith asked where C.A. was; her parents replied that she was at Paul Archer's house, which was also located on the same street. Smith instructed Randy Archer to retrieve C.A. and bring her back to the residence.

2

When C.A. arrived home and saw the police officers, she started crying and tried to walk inside the house. Smith testified, "And her parents said, 'It's okay. They're here to talk to you. [M.A.] has talked to them.' When they told her that, she started crying more and went ahead and went into the house." Smith testified that he was unable to have any meaningful interaction with C.A. that evening.

Later that evening, after Deputy Smith left the home of Randy and Gina Archer, police were called to return to the residence. Sergeant Clint Jacobs arrived at the household to find Randy and Gina Archer waiting outside. The Archers, who appeared to be very upset, told Jacobs that Paul Archer had come to their home after Smith and the other deputies left. Jacobs testified,

> They said he was pacing around, saying things that they couldn't understand. Said he was wringing his hands. He eventually—they said that he went in and woke [C.A.] up, who was sleeping, and had a brief conversation with her.
>
> . . . .
>
> They said that he told [C.A.] that he would have never touched [M.A.] if the other gentleman who was involved in the case hadn't touched her,[1] and also said that he would never be able to associate or I think hold her again, was the quote.

Randy and Gina Archer also told Sergeant Jacobs that Sue Moreno, Randy Archer and Paul Archer's sister, had come to their home after the police left and said that she "was concerned about Paul Archer" because of his "erratic" and "scary" behavior. The Archers told

---

[1]  Testimony indicated that Archer accused Randy Anderson, M.A.'s father, of having improper sexual contact with C.A. C.A. denied that Anderson had ever touched her improperly during her testimony, and no evidence presented at trial corroborated Archer's allegation.

Jacobs that Moreno was "very distraught," "continually apologizing," and saying that she "had never been aware of what had happened."

Jacobs asked the Archers to contact Moreno and have her return to the house so that she could be questioned. Jacobs testified that when Moreno arrived, she was crying and distraught, saying that she "never knew what was going on." Moreno testified that she signed a statement that night, in which she wrote, "On the evening of January 1st, 2006, my brother Paul Archer stated to me that he had done some bad things to [M.A.] . . . and the guy across the street had done some bad things to [C.A.] . . . . This occurred at his home . . . . He was wringing his hands and pacing." At trial, Moreno changed her story: she testified, "I don't believe I heard this statement that I wrote correctly. I believe that what my brother had said to me was, 'They said that I did bad things to [M.A.].'"

Shortly thereafter, Detective Tommy Ward obtained a warrant to search Paul Archer's house for pornographic videotapes, condoms, and condom wrappers. When Ward and another detective discovered girls' panties and an orange bathing suit in Archer's room, they immediately halted the search in order to obtain a new warrant that covered those items. After obtaining the second warrant, Ward seized the three pairs of panties and the two-piece bathing suit from Archer's room.

The articles of clothing confiscated in the search of Archer's home were sent to a laboratory for testing. DNA analysis indicated that the bottom piece of the two-piece bathing suit contained stains where sperm cells were discovered and stains that were consistent with mixtures of bodily fluids. The State's DNA expert testified that to a reasonable degree of scientific certainty,

4

Archer was the source of the sperm cells: "The probability of selecting an unrelated person at random who could be a source of this DNA profile is approximately one in 3.682 quintillion for Caucasians . . . ." Further, neither Archer nor C.A. could be excluded as contributors to the stains that were mixtures. No sperm cells were located on any of the three pairs of panties, but each pair contained biological material that was consistent with a mixture—neither Archer nor C.A. could be excluded as contributors to those stains.

Archer was arrested and tried on two indictments. Cause number CR2006-106 related to offenses against M.A., charging six counts of indecency with a child by contact and one count of aggravated sexual assault. Cause number CR2006-107 related to offenses against C.A., charging two counts of indecency by exposure, three counts of indecency by contact, and six counts of aggravated sexual assault.

At trial, both victims testified. C.A. stated that on December 31, 2005, she was with her uncle Paul Archer, whom she had asked repeatedly to get her some fireworks, at Archer's house. C.A. testified that Archer "made [her] do something bad" before he would agree to purchase the fireworks: she said that Archer told her that "we had to do it in order to get the fireworks"—C.A. understood "do it" to mean "have sex." She stated that Archer removed her shirt, pants, and underwear and tried to touch her "boobs." C.A. went on to say that Archer touched her "boobs" with his hands and that he also touched her "wee-wee" with his hands. She testified that Archer "moved his fingers" while touching her "wee-wee" and that he touched her "wee-wee" with his tongue and "started licking." C.A. stated that Archer removed his pants and exposed his "wiener." She testified that Archer made her touch his "wiener" by curving her fingers around it and moving her hand up

5

and down. Archer also touched her "wee-wee" with his "wiener" that night. After the encounter, Archer allowed C.A. to shoot off some of the fireworks.

C.A. also testified about another incident that occurred at Paul Archer's house on December 23, 2005. She said that she asked Archer to rent her a movie, which he did. She testified that when he returned with the movie, she went with him to his room, where the two "had to have sex." C.A. testified that Archer removed all her clothes and all his clothes. Archer touched her "wee-wee" and her breasts, and he made her touch his "wiener." She also stated that Archer touched her "wee-wee" with his "wiener," although he did not put it inside her "wee-wee." C.A. said that after this occurred, she got to watch the movie and eat homemade popcorn.

C.A. testified that Archer touched her "wee-wee" with his "wiener" once or twice in 2005 and that he had also done it prior to 2005. She remembered another incident on New Year's Eve in 2003, where Archer touched her "wee-wee" with his tongue and "started licking up and down." On this occasion, Archer touched the "inside" of her "butt" with his "wiener." He also put his "wiener" in her mouth, and "sperm" came out of his "wiener." C.A. testified that this was not the first time that he put his "wiener" in her mouth.

C.A. said that she first began having these kind of encounters with Archer when she was eight years old. C.A. testified that Archer often buys her candy and that "[y]ou need to have sex" in order to get the candy. C.A. also said that Archer made her watch movies of people having sex, which made her feel "uncomfortable."

C.A. testified to an incident where Archer touched her and forced her to touch him before she was allowed to go with her friend M.A. to Landa Park. C.A. also testified about "three

6

or four" trips to Dollar General, where Archer would buy her dolls and other toys. She stated that M.A. accompanied them on one of these trips. C.A. testified that Archer purchased an electric motor scooter and a thirty-six-inch television for her. C.A. also testified about a trip that she took to Corpus Christi with Archer, where they stayed alone together in what she described as "a very uncomfortable tent" on the beach. She talked about how Archer would take her to Sea World, Mr. Gatti's, and Schlitterbahn. C.A. stated that Archer is her favorite uncle because he "always spoils" her with "candy and stuff."

C.A. testified that she has an orange bathing suit, and she identified the bathing suit from which the DNA samples were taken as her bathing suit. She also identified two of the seized pairs of panties as her own and testified that the other pair of panties recovered by police belonged to M.A.

Cristina Salley, the sexual assault nurse examiner who examined C.A., also testified. She related the history that C.A. gave her as part of the examination, which was largely consistent with her trial testimony. Salley testified that she did not discover any trauma in C.A.'s examination, but stated that she did not expect to find trauma because one study has shown that a large percentage of examinations conducted on females who have been verifiably vaginally penetrated show no genital trauma.

M.A. testified that she often played with C.A. at Archer's house, where they would also watch movies and have homemade popcorn. She testified that one time around Christmas 2005 Archer made her "[t]ouch his private spot." She said that she saw his "private spot" and had to touch it by curling her fingers around it. M.A. stated that Archer touched her on her "private spot where

7

[she] pee[s]" with his hand. M.A. testified that C.A. was in the room during this encounter. When asked whether Archer did something to C.A. on that occasion, M.A. replied, "He did the same thing as he did to me." M.A. testified that she saw Archer do this to C.A.

M.A. said that Archer touched her "private spot" at his house or C.A.'s house "[a]bout five times." She had to touch his "private spot" around "five or six" times; each time she saw his "private spot." M.A. testified that "just once" she "had to lick his private spot just a little."

M.A. testified that she had to touch Archer in order to go to Landa Park with him and C.A., which she "really wanted" to do. She stated that she also went to Dollar General with Archer and C.A. and that Archer bought them dolls and candy there; M.A. testified that she had to touch Archer at his house before they could go.

Jennifer Anderson testified about M.A.'s outcry to her on January 1, 2006. She testified that M.A. and C.A. were friends and that they would often spend time with Archer at his house. Jennifer Anderson testified that a few months before January 2006, M.A. related to her that C.A. said that Archer was touching her vagina, but Anderson testified that she "didn't think that he could do something like that" because "he seemed to be a very nice person."

Randy Archer testified that Paul Archer came to his house on January 1 and that "he was wringing his hands and he said he would never have touched [M.A.] if Randy Anderson wouldn't have touched [C.A.].'"

Archer did not testify. He called one witness, the custodian of records at the hospital where C.A. was examined, in order to introduce C.A.'s medical records from the January 5 visit. Archer also introduced a public record showing that C.A.'s step-brother is a registered sex offender.

8

Archer's attorney argued that children make up stories and that C.A. may have been victimized by her step-brother.[2] The jury found Archer guilty of all eighteen counts and assessed the maximum term of incarceration for each count. The trial court ordered that the sentences imposed for the offenses committed against C.A. will be served consecutively to the sentences for the offenses committed against M.A. This appeal followed.

## DISCUSSION

**Voir Dire**

In his first issue, Archer complains that the trial court improperly limited his voir dire questioning by refusing to let him ask a commitment question concerning whether the prospective jurors could consider probation even if the facts established that Archer is guilty. Archer claims that the trial court "sustained the State's objection that the question was an improper commitment question." The following exchange occurred during voir dire:

[Defense Counsel]: All right. If the facts established that the defendant is guilty, can you consider probation?

[The State]: That's an improper commitment question because—

The Court: It's not proper to solicit a commitment to any set of facts.

[Defense Counsel]: All right.

The Court: Hypothetical or otherwise.

---

[2] Both C.A. and M.A. were questioned about contact with C.A.'s step-brother. Both children denied having ever been touched improperly by him.

9

[Defense Counsel]: Is there any member of the jury panel who could not consider a full range of punishment in this case, including probation, based upon any facts?

Even if the trial court erred by refusing to allow Archer to ask the question, we still must overrule Archer's first issue because the error was harmless. *See* Tex R. App. P. 44.2 (b) ("Any [nonconstitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Archer was allowed to ask his next question, which was substantially similar to the prior question and elicited the same information sought by the question at issue—whether the prospective jurors could consider probation as part of the range of punishment. The only person who responded to that question in the negative was excused from the panel by agreement.

Further, earlier in the voir dire questioning, the prosecutor for the State asked the panel the following question:

And so the appropriate question that each of you need to consider at this moment is whether, in a proper case in which the law allows it and the facts justify it, whatever those facts may be that you haven't heard yet, but can you fully and fairly consider that entire range of punishment, including both the minimum and the maximum as I described? And that also does include probation only at your recommendation as jurors if the punishment does not exceed ten years in the penitentiary.

The only prospective juror who answered that she could not consider the full range of punishment was the same one who answered Archer's question in the negative and who was, as noted above, excused from the panel by agreement. Because the question that Archer complains that he was not allowed to ask was asked by both Archer and the State and answered by the panel, we hold that any error was harmless and overrule Archer's first issue.

10

**Consecutive Sentences**

In his second issue, Archer argues that the trial court erred by ordering that the sentences in cause number CR2006-107 be served consecutively to those in cause number CR2006-106, urging that no statutory authority exists for such an order. We disagree.

Archer bases his argument on the language of section 3.03 of the Texas Penal Code, which provides,

> If the accused is found guilty of more than one offense arising out of the same criminal episode, the sentences may run concurrently or consecutively if each sentence is for a conviction of . . . an offense . . . under Section 21.11, 22.011, 22.021, 25.02, or 43.25 committed against a victim younger than 17 years of age at the time of the commission of the offense . . . .

Tex. Penal Code Ann. § 3.03(b)(2)(A) (West Supp. 2006). Archer does not dispute that the offenses arose out of the same criminal episode; rather, he argues that because the statute uses the words "a victim," it does not contemplate consecutive sentences for multiple offenses committed against multiple victims. But as Archer notes in his brief, several courts of appeals have rejected this interpretation of section 3.03, pointing out that the plain language of the statute allows sentences to run consecutively "if *each sentence* is for a conviction of . . . an offense . . . committed against a victim younger than 17 years of age," *id.* (emphasis added), which clearly contemplates consecutive sentencing for multiple offenses committed against multiple victims. *See Dale v. State*, 170 S.W.3d 797, 800–01 (Tex. App.—Fort Worth 2005, no pet.); *Salazar v. State*, 127 S.W.3d 355, 363–65 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). "There is no language in the section supporting appellant's preferred interpretation that all of the sentences must be for offenses against

the same victim. To the contrary, so long as the victim of each of the offenses was under 17, the requirements of the statute's plain language are clearly met." *Salazar*, 127 S.W.3d at 364–65.

Here, Archer was convicted of eighteen offenses. Each offense was under section 21.11 or section 22.021 of the penal code. Each offense was committed against either C.A. or M.A., both of whom were younger than seventeen years old at the time of the commission of each offense. Thus, the trial court clearly had the authority under section 3.03 to order that the sentences be served consecutively, and given the heinous nature of the crimes, it is not surprising that it chose to do so. We overrule Archer's second issue.

**Admission of Hearsay**

In his third and fourth issues, Archer urges that the trial court erred by admitting hearsay testimony of an investigating officer on two occasions. Archer complains about the following two exchanges:

Q: Other than what she told you that you just testified to, was there any other complaint that [Jennifer Anderson] made?

A: Yes, sir.

Q: And what was just the basic nature of that complaint?

[Defense Counsel]: Judge, I'm going to object to the hearsay.

[The State]: Judge, at this time, I'd offer it not for the truth of the matter asserted; just based on the information acted upon by this officer for his future actions. And I assure you that Ms. Anderson will be here as a witness, as well as [M.A.] and [C.A.], all of whom which [sic] the complaints basically will be about. They will testify.

[Defense Counsel]: That's still—the substance of what she told them is still hearsay.

12

The Court:  It is hearsay.  However, for the purposes of just—it's not being admitted for the truth of any of the content of the statement; it's being admitted because this officer heard it and took certain actions based on that information.  So keep that in mind when you hear what he's about to say.  It is hearsay.  It's not admissible for the truth of the matter asserted within the statement.  It's admissible solely to show why this officer did whatever he did once he heard it.

Q:  If you would, just tell the ladies and gentlemen of the jury, what was the entirety of the complaint?  Again, just the basics.

A:  I arrived on the scene and met with Jennifer Anderson.  She told me that her daughter—several months ago, her daughter [M.A.] had told her that Paul Archer had touched his niece, [C.A.], on several occasions, and that had [sic] made her touch him.  Then she told me that she didn't report it.  On the 1st of January, she found out that—[M.A.] told her that she had also been touched and had touched Paul Archer.

. . . .

Q:  And generally speaking, again, to further your investigation, what did [M.A.] relate to you?

[Defense Counsel]:  Judge, once again, I'm going to object to the hearsay on this.

The Court:  Again, this is not being admitted for the purpose of the truth of the matter asserted within [M.A.]'s statement; it's simply being submitted to show why this officer took whatever actions he took once he heard it.

Q:  You may answer the question.

A:  Okay.  I sat down at the table with [M.A.], asked her what was going on, explained who I was, told her that we were there to help her, and she told me that Mr. Archer had touched her once before Halloween and once or twice after.

And she didn't know the dates, so we pulled out a calendar and I would show her by holiday.  I'd say, "Well, was it before or after Thanksgiving?  Before or after Christmas?  Before or after Halloween?"  And she was able to recognize Halloween.  She said it happened once before Halloween and once after.

Archer argues, relying on *Hill v. State*, 817 S.W.2d 816, 818 (Tex. App.—Eastland 1991, pet. ref'd),

that the officer's statements about what Jennifer Anderson and M.A. told him were inadmissible

13

because Archer "never challenged the methods of investigation employed by Deputy Smith. No objection was made that [Archer] was improperly arrested or that any search was conducted without probable cause. Therefore the State was under no obligation to explain Deputy Smith's actions, and the use of hearsay to explain his actions cannot be justified."

The court of criminal appeals has held that a police officer "should not be permitted to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports on grounds that she was entitled to tell the jury the information upon which she acted." *Schaffer v. State*, 777 S.W.2d 111, 114–15 (Tex. Crim. App. 1989). When an "officer's actions (e.g., an arrest or a search) are not put into question before the jury, testimony that the officer acted upon 'information received' or words to that affect [sic] should be sufficient." *Id.* at 115 n.4.

We hold that the error was harmless for three reasons. *See* Tex. R. App. P. 44.2(b) ("Any [nonconstitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

First, the same information was put before the jury without objection through the testimony of Jennifer Anderson and M.A. *Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) ("It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged." (quoting *Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. 1978))). Jennifer Anderson testified that M.A. told her months before January 2006 that C.A. complained that Archer was touching her vagina, that M.A. told her on January 1 that Archer had touched her vagina, and that she related this

14

information to the police, all without objection. M.A. testified without objection about five or six instances of improper touching in far more detail than the officer's testimony.

Second, the trial court instructed the jury that the testimony was "simply being submitted to show why this officer took whatever actions he took once he heard it." While the testimony should not have been admitted for any purpose, this instruction limited the harm from the erroneous admission of the testimony by prohibiting the jury from considering it for the truth of the matter asserted. *See Moore v. State*, 882 S.W.2d 844, 847 (Tex. Crim. App. 1994) (holding that appellate courts must presume that instructions to the jury "are efficacious").

Third, overwhelming evidence of Archer's guilt was introduced at trial. *See Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) ("[T]he presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error."). Evidence supporting the verdict includes the testimony of C.A. and M.A.; Jennifer Anderson's testimony about M.A.'s outcry; the statements of Randy Archer, Gina Archer, and Sue Moreno that Paul Archer told them that he only touched M.A. because Randy Anderson had touched C.A.; the DNA test results that found semen consistent with Paul Archer's DNA and biological material consistent with C.A.'s DNA on the bottom piece of C.A.'s bathing suit, which was found in Archer's bedroom; and other physical evidence found in Archer's bedroom that corroborated C.A.'s and M.A.'s testimony, including Mr. Gatti's "play tickets," a doorstop that C.A. testified that Archer would use to lock his bedroom door before he abused her, pornographic videos that may have been the ones that C.A. testified that Archer made her watch and that made her feel "uncomfortable," and the bathing suit and panties that one officer testified constituted "trophies" that child molesters often

15

keep.  Thus, we hold that any error that was preserved was harmless and overrule Archer's third and fourth issues.

**Expert Testimony**

In his fifth issue, Archer claims that the trial court erred by admitting, over his objections, the following testimony by sexual assault nurse examiner Cristina Salley concerning her finding no trauma to C.A.'s genitals in her examination of C.A.:

> Q:  Do you—is there a percentage of—that you—best you can come up with of how many victims actually have a normal exam—how many child victims actually have a normal exam?
>
> A:  It's close to 85% of children exams have a normal exam [sic], children in adolescence.  Doctor Kellogg did a study a couple of years ago.  She's in San Antonio, and she's been doing this for over 25 years where she actually—
>
> [Defense Counsel]:  Judge, I'm going to object to any testimony about what Doctor Kellogg said.  She's not here to testify.  It's a hearsay objection.
>
> The Court:  I'm waiting for a response from the State.
>
> Q:  Ms. Salley, are you familiar with Doctor Kellogg?
>
> A:  Yes, I am.
>
> Q:  And where does Doctor Kellogg office out of?
>
> A:  Doctor Kellogg is in San Antonio.  She is at—they just changed their name to Child Safe.  It was the Alamo Children—Alamo City—or Alamo Advocacy Center, Children's Advocacy Center in San Antonio.
>
> Q:  And is Doctor Kellogg an expert in child sexual abuse?
>
> A:  Yes, she is.
>
> Q:  And does she have—this Doctor Kellogg is a lady.  Correct?

16

A: Yes.

Q: Nancy Kellogg?

A: Uh-huh.

Q: And does Doctor Kellogg have writings that she herself has written?

A: Yes.

Q: Does she have very many of them, to the best of your knowledge?

A: Yes, she does.

Q: And is she renowned as an expert in this area?

A: Yes, she is. She has over 25 years' experience.

[Defense Counsel]: Same objection, Judge. I don't believe it qualifies as a learned treatise.

The Court: Overruled.

Q: So if you can go ahead and tell us about the study you're referring to from Doctor Kellogg.

A: Okay. This particular one has to do with adolescents who are pregnant. Okay. So there has been penile vaginal penetration and they're pregnant. In 83% of those cases, there is no trauma there. So that just goes to further clarify that we don't expect to find trauma when we do exams on children.

Archer argues that the State did not establish the predicate for the Kellogg study's admissibility under the learned-treatise exception to the hearsay rule. Archer also urges that even if the Kellogg study were admissible under the learned-treatise exception, Salley's testimony did not comply with the requirements of the exception.

Texas Rule of Evidence 803(18) provides that the following evidence is not excluded by the hearsay rule:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Tex. R. Evid. 803(18). Archer argues that the trial court erred by admitting the testimony because (1) the State failed to make "a showing that the writing had been published in a manner recognized by" the exception, and (2) "Salley did not read a portion of the Kellogg study into evidence; rather, she summarized the conclusion reach[ed] in the Kellogg study." The State apparently concedes that the learned-treatise exception was not met, but urges that as an expert witness, Salley was permitted to rely on the Kellogg study and to testify about the materials that she relied on, citing Texas Rule of Evidence 702.

We review a trial court's evidentiary ruling for an abuse of discretion. *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002). A trial court abuses its discretion when its ruling falls outside the zone of reasonable disagreement. *Id.*

Texas Rule of Evidence 705 provides that an expert witness "may testify in terms of opinion or inference and give the expert's reasons therefor without prior disclosure of the underlying facts or data." Tex. R. Evid. 705. An expert witness may base her opinions on—and testify about—facts or data that are inadmissible, as long as the information is of a type reasonably relied on by experts in her field. *Joiner v. State*, 825 S.W.2d 701, 707–08 (Tex. Crim. App. 1992).

18

Salley was qualified by her knowledge, skill, experience, training, and education as an expert witness in the field of child sexual abuse. *See* Tex. R. Evid. 702. She testified that she relied on the Kellogg study in reaching her opinion that an examination's failure to uncover genital trauma does not indicate that sexual activity has not occurred. Therefore, the trial court did not abuse its discretion by allowing Salley to testify about the results of the Kellogg study.

Even if the trial court did err, we would hold that the error was harmless because substantially similar testimony was elicited from this witness multiple times without objection. *See Leday*, 983 S.W.2d at 717 ("It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged."). Salley testified that "[i]t's normal to have a normal exam," that "if trauma had occurred, there is a possibility that would heal very quickly without any scar tissue left," that finding injury is "more unusual than finding a normal exam," and that 85 to 95% of sexual assault victims have normal exams, all without objection. We overrule Archer's fifth issue.

## CONCLUSION

Having overruled Archer's issues on appeal, we affirm the trial court's judgment.

_____

Diane Henson, Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed: August 17, 2007

Do Not Publish

19